**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEBRASKA**

---

MARCUS WITCHET,

      Plaintiff,

v.

UNION PACIFIC RAILROAD COMPANY,

      Defendant.

CASE NO. 8:18-cv-00187

**DEFENDANT'S BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

---

## I.    INTRODUCTION

Plaintiff Marcus Witchet ("Witchet") drove large commercial trucks carrying fellow employees on public roads. Doing so safely is mandatory, not merely a suggestion. "Woe unto the employer who put [an unqualified] employee behind the wheel of a vehicle owned by the employer which was involved in a vehicular accident." *Chandler v. City of Dallas*, 2 F.3d 1385, 1395 (5th Cir. 1993).

While working for Union Pacific Railroad Company ("Union Pacific"), Witchet suffered a stroke in the cortical area of his brain. The Federal Motor Carrier Safety Administration ("FMCSA") guidelines clearly instruct that an individual who suffers a stroke in the cortical area of the brain should not drive commercial vehicles for five years. After reviewing Witchet's medical records and receiving an opinion from an independent, board-certified neurologist whom Union Pacific retained to determine whether Witchet suffered the stroke, Union Pacific restricted him from driving trucks for five years as directed by the FMCSA.

Despite the clear need to restrict Witchet from driving commercial vehicles for five years, Witchet claims that Union Pacific violated the Americans with Disabilities Act

("ADA") and relies on the opinion of his retained expert to claim he never had a stroke. Although the medical evidence overwhelmingly suggests Witchet suffered a stroke—as does Witchet's own neurologist and every medical professional except Witchet's retained expert—neither the Court nor the jury must make that determination. The issue is not which medical professional is "correct."  The ADA allows employers to make reasonable, safety-based judgments relying on objective medical evidence and the FMCSA's medical qualification standards without running afoul of the law.  It is not the province of a jury to second-guess those decisions. The undisputed facts establish that Union Pacific made a reasonable, safety-based judgment that relied on objective medical evidence, the conclusions of medical professionals including Witchet's treating physicians, and the FMCSA's guidance. For these reasons, and as explained in more detail below, Witchet's ADA claims fail as a matter of law and should be dismissed.

## II. STATEMENT OF UNDISPUTED MATERIAL FACTS

Union Pacific submits the following statement of material facts for its Motion for Summary Judgment only. Most of the material facts are supported by Plaintiff's own statements in his depositions, ("Witchet Dep."), attached as Ex. 1A.

### A. Witchet's Employment at Union Pacific

1.      Witchet began working for Union Pacific in September 2011. (Ex. 1A, Witchet Dep. 17:16-18:9). Union Pacific classified him as a "Truck Operator 2TN+" (two-ton plus). (Ex. 1A, Witchet Dep. 19:13-16; 33:3-7).

2.      As a Truck Operator, Witchet drove large trucks carrying workers and materials on interstates and public streets to worksites. (Ex. 1A, Witchet Dep. 29:4-7; 33:14-24; 38:5-7; 39:5-15). Witchet spent about half of his time operating trucks and half

performing manual labor on and around railroad tracks. (Ex. 1A, Witchet Dep. 36:17-21; 42:16-43:3).

3.     The Truck Operator's written job description identifies the essential functions that the individual must perform, among them:

a. Understand and follow company and industry safety rules, practices and procedures (UP_Witchet_000453);

b. Work around large equipment such as railcars, locomotives and cranes (UP_Witchet_000455); and

c. Ensure compliance with all railroad rules and regulations for safety, and practice safe work habits to prevent accidents or injuries (UP_Witchet_000455).

(Witchet Dep. Exs. 2-3, at UP_Witchet_000452-56, 000462-63, authenticated at Ex. 1A, Witchet Dep. 46:21-47:5, 48:17-21 and attached as Ex. 1B).[1]

4.     Witchet admits that the Truck Operator position is "safety-sensitive" and that safety was a "very important" part of his job. (Ex. 1A, Witchet Dep. 45:23-46:1; 51:11-14).

5.     A Truck Operator must obtain and maintain a Commercial Driver's License ("CDL"). (Ex. 1A, Witchet Dep. 37:2-5; Ex. 1B at UP_Witchet_000454, 000462). A Truck Operator must also meet the physical and medical qualifications established by the FMCSA. (Ex. 1B at UP_Witchet_000463; Ex. 1A, Witchet Dep. 49:17-50:2).

**B.     Witchet's Emergency Room Physicians Diagnose Him with a Stroke**

6.     On October 16, 2015, Witchet presented to an emergency room in Tyler, Texas due to a "sudden onset of numbness with associated tingling to [his] left arm" that grew progressively worse. (Ex. 1A, Witchet Dep. 66:18-23; Witchet Dep. Ex. 7, at

---

[1] Witchet testified that two written job descriptions (Ex. 1B) applied to his position. (Ex. 1A, Witchet Dep. 49:6-16).

UP_Witchet_000352, authenticated at Ex. 1A, Witchet Dep. 72:3-6, attached as Ex. 1C). Witchet's symptoms also included lightheadedness and dizziness. (Ex. 1A, Witchet Dep. 84:20-24). He was unable to hold objects in his hands. (Ex. 1C at UP_Witchet_000352).

7.      Witchet's symptoms caused an emergency room doctor to be "concerned for a stroke." (Ex. 1C at UP_Witchet_000358). Witchet underwent a neurological workup, including CT and MRI brain imaging studies. (Ex. 1C at UP_Witchet_000350, 000358; Ex. 1A. Witchet Dep. 72:17-21). According to Witchet's own neurologist, Dr. Atta Rehman ("Rehman"), the MRI revealed that Witchet suffered a stroke. (Ex 1C at UP_Witchet_000350; Ex. 1L, Deposition of Dr. Atta Rehman 62:23-63:10).

8.      Witchet's hospital discharge records state that his "primary diagnosis" was an "Acute CVA (Cerebrovascular Accident)." (Ex. 1C at UP_Witchet_000384). An "acute cerebrovascular accident" is the medical term for "stroke." (Ex. 1L, Dr. Rehman Dep. 20:9-12).

## C.      Witchet Informs Union Pacific of His Stroke and Union Pacific Begins a Fitness for Duty Evaluation

9.      After his hospital release, Witchet called Union Pacific and stated that he had suffered a "mild stroke." (Witchet Dep. Ex. 6 at UP_Witchet000333, authenticated at Ex. 3, Dr. Charbonneau Dec., ¶ 3 attached as Ex. 3A; Ex. 4, Declaration of Rhonda Ross ("Ross Dec.") ¶ 3)[2] Union Pacific advised Witchet that it would begin a fitness-for-duty ("FFD") evaluation. (Ex. 1A, Witchet Dep. 68:5-8; 69:16-22).

---

[2] Witchet's Medical Comments History shows that he informed Union Pacific of a "mild stroke" during this call. (Ex. 3A at UP_Witchet_000333). Witchet claims that he told Union Pacific that the emergency room doctors were "thinking it was [a stroke], but nothing was concrete." (Ex. 1A, Witchet Dep. 68:12-16).

10.     Union Pacific conducts an FFD evaluation when there are legitimate concerns over an employee's ability perform the job safely. (Ex. 2, Declaration of Dr. Holland ("Holland Dec.") ¶ 3). The FFD focuses on the safety risks in the railroad environment associated with the employee's specific health condition and job duties. (Ex. 2, Dr. Holland Dec. ¶ 3). Union Pacific works with the employee to gather pertinent medical records and sometimes arranges for an independent medical provider to evaluate the employee's records and condition. (Ex. 2, Dr. Holland Dec. ¶ 3).

11.     Union Pacific removed Witchet from service pending the results of his FFD evaluation. (Ex. 1A, Witchet Dep. 81:1-4). Union Pacific requested several categories of information relevant and limited to determining if he had a stroke, including Witchet's emergency room records, hospital discharge summary, diagnostic test results, clinic notes from his treating neurologist, and other related documents. (Witchet Dep. Ex. 8 at UP_Witchet_000071, authenticated at Ex. 1A Witchet Dep. 80:7-17 and attached as Ex. 1D). Witchet did not consider any of these requests to be inappropriate and began providing the records. (Ex. 1A, Witchet Dep. 81:6-82:4).

12.     Several days after his release from the hospital, Witchet presented to his primary care physician, Dr. Syed Zaidi. (Ex. 1A, Witchet Dep. 87:20-25). The records from that visit identify Witchet's "chief complaint" as "Follow up on stroke." (Witchet Dep. Ex. 10 at UP_Witchet_000236, authenticated at Ex. 1A, Witchet Dep. 87:16-22, attached as Ex. 1E). The records also state the reason for Witchet's hospitalization was "Stroke 10/2015." (Ex. 1E, at UP_Witchet_000236).

13.     In early November 2015, Witchet underwent a sleep study, the records from which show that Witchet had a "past medical history significant for stroke." (Ex. 1A,

Witchet Dep. 91:2-7; Witchet Dep. Ex. 11 at UP_Witchet_000148, authenticated at Witchet Dep. 91:1-7 and attached as Ex. 1F.)

14.     Witchet also visited Dr. Rehman, a neurologist, on October 20 and November 9, 2015. (Ex. 1A, Witchet Dep. 82:15-83:3; 123:7-13). Dr. Rehman ordered Witchet to undergo a brain MRI on November 9, 2015. (Ex. 1A, Witchet Dep. 86:10-13).

15.     Union Pacific's Assistant Medical Director, Dr. John Charbonneau ("Charbonneau"), advised the Health and Medical Services Department that Witchet's records showed several serious health conditions. (Ex. 3A at UP_Witchet_000331). Dr. Charbonneau noted that the diagnoses in the "limited information" to date included stroke, a brain lesion (type not specified), a possible cardiac condition, and a lumbar (spine) issue. (Ex. 3A at UP_Witchet_000331). Dr. Charbonneau concluded that Witchet remained not fit-for-duty until Union Pacific could obtain all of the relevant medical records and test results for these conditions. (Ex. 3A at UP_Witchet_000331).

16.     To assist with the process, Witchet authorized Union Pacific to contact his various doctors directly to gather the records. (Ex. 1A, Witchet Dep. 103:10-104:23). Union Pacific continued to receive Witchet's records throughout November and December 2015. (Ex. 3A at UP_Witchet_000329-30).

17.     In mid-December 2015, Union Pacific received the results of the November 9 MRI ordered by Dr. Rehman. (Ex. 1A, Witchet Dep. 110:24-111:14; Ex. 3A at UP_Witchet_000329).

18.     Dr. Charbonneau wrote that the November 9 MRI "does not show a definite CVA [stroke] but that does not mean that he did not have one. The original MRI showed a small parietal white matter CVA and one of his discharge diagnoses was

CVA." (Ex. 3A at UP_Witchet_000329). The November 9 MRI record shows that it was read without comparison to the October 16 MRI taken during Witchet's hospital stay several weeks earlier. (Witchet Dep. Ex. 16, at UP_Witchet_000271, authenticated at Ex. 1A, Witchet Dep. 109:16-21, attached as Ex. 3B; Ex. 3, Dr. Charbonneau Dec. ¶ 4).

19.    Union Pacific eventually cleared Witchet for his cardiology and spine conditions in late December 2015. (Ex. 1A, Witchet Dep. 119:2-20; 207:7-17; Ex. 3A at UP_Witchet_000328). But Union Pacific still needed additional neurological records and thus could not render a final FFD decision.  (Ex. 1A, Witchet Dep. 119:21-120:7; Ex. 3A at UP_Witchet_000328).

20.    In December 2015, Dr. Charbonneau noted that Witchet would need medical restrictions for at least one year, "possibly longer depending on the content of the information to come." (Ex. 3A at UP_Witchet_000330; Ex. 1A, Witchet Dep. 105:25-106:5).

**D.    Union Pacific Seeks Assistance from an Independent Neurologist Who Concludes that Witchet  Had a Stroke**

21.    In early January 2016, Witchet authorized Dr. Charbonneau to speak with Dr. Rehman because, at that point, the two doctors differed on Witchet's diagnosis. (Ex. 1A, Witchet Dep. 121:8-25; 123:25-124:16).

22.    Dr. Charbonneau suspected that based on Witchet's symptoms, October 16 MRI, and discharge diagnosis of "Acute CVA," Witchet had suffered a stroke. (Ex. 3, Dr. Charbonneau Dec. ¶ 5; Ex. 3A at UP_Witchet_000326, 00329). Dr. Rehman believed, at least as of January 2016, that Witchet had suffered a transient ischemic

attack ("TIA").[3] (Ex. 1A, Witchet Dep. 123:25-124:16; Ex. 3A at UP_Witchet_000326). The two doctors eventually spoke on the phone, and Dr. Rehman sent Union Pacific additional clinical notes from Witchet's two visits. (Ex. 1A, Witchet Dep. 123:1-10).

23.     In late January 2016, Union Pacific retained Dr. Reed Wilson ("Dr. Wilson"), a board-certified neurologist, for an independent file review and assessment of Witchet's condition. (Ex. 3, Dr. Charbonneau Dec. ¶ 6).  Union Pacific engaged Dr. Wilson because of the complexity of the case and because Witchet's symptoms, discharge diagnosis, and medical records that used the term "stroke" conflicted with Witchet's insistence that he did not have one. (Ex. 3, Dr. Charbonneau Dec. ¶ 6).

24.     Witchet agreed it was appropriate for Union Pacific to retain Dr. Wilson for the file review. (Ex. 1A, Witchet Dep. 127:16-23).

25.     In early February 2016, Dr. Wilson provided a report to Union Pacific containing his diagnosis of Witchet's neurological condition. (Ex. 2A, UP_Witchet_000292-96, authenticated at Holland Dec. ¶ 4). Dr. Wilson concluded that Witchet had suffered a "small right parietal stroke on October 16, 2015 with no measurable permanent clinical residuals." (Ex. 2A, UP_Witchet_000294).

26.     Dr. Wilson also stated that Witchet had a "moderate to high risk for future sudden incapacitation." (Ex. 2A, UP_Witchet_000294). Dr. Wilson based this conclusion on the risk assessments and recommendations set forth in FMCSA guidance. (Ex. 2A, UP_Witchet_000294; Ex. 1A, Witchet Dep. 129:10-20).

---

[3] A transient ischemic attack is a brief episode of neurological dysfunction that, unlike a stroke, is not associated with permanent death of brain tissue. (Ex. 2, Holland Dec. ¶ 9; Ex. 1L, Rehman Dep. 76:13-23).

**E.** **FMCSA Guidelines for Commercial Drivers Who Suffer a Stroke**

27.    The FMCSA is an agency of the U.S. Department of Transportation ("DOT") and aims to reduce crashes involving large trucks and buses. (Ex. 2B, Medical Examiner Handbook, p. 8). FMCSA regulations apply to employers, employees and commercial motor vehicles (vehicles weighing more than 10,000 pounds) operating in interstate commerce. 49 C.F.R. §§ 390.3(a), 390.5.[4]

28.    A person cannot lawfully operate a commercial vehicle if not qualified to do so in compliance with the FMCSA's applicable physical and medical standards. 49 C.F.R. §§ 391.11(a),(b)(4); 391.41. To be qualified to drive a commercial vehicle, the person must have "no established medical history or clinical diagnosis" of any "condition which is likely to cause a loss of consciousness or any loss of ability to control a commercial motor vehicle." 49 C.F.R. § 391.41(b)(8).

29.    The FMCSA relies on medical examiners to assess if the driver meets the physical qualification requirements in 49 C.F.R. § 391.41. (Ex. 2B, Medical Examiner Handbook, p. 43). To assist medical examiners determine if the individual is medically qualified and safe to drive, the FMCSA provides recommendations and guidelines in its Medical Examiner Handbook. (Ex. 2B, Medical Examiner Handbook, p. 51). The FMCSA ensures these guidelines are evidence-based by relying on a systematic review of the available scientific literature, expert analyses of data, and recommendations from Medical Expert Panels. (Ex. 2B, Medical Examiner Handbook, p. 51).

---

[4] Witchet operated trucks "all over" (Ex. 1A, Witchet Dep. 42:8-10), but if he only drove vehicles in Texas in intrastate commerce, Texas has adopted the relevant FMCSA regulations. 37 Tex. Admin. Code § 4.11(a).

30. The FMCSA Medical Examiner Handbook directs medical examiners to disqualify a driver who "has a medical condition that endangers the health and safety of the driver and the public." (Ex. 2B, Medical Examiner Handbook, p. 48). Medical examiners may also temporarily disqualify a driver based on certain conditions and apply a "waiting period" that prohibits commercial driving until the individual is medically fit for duty. (Ex. 2B, Medical Examiner Handbook, p. 49).

31. The Handbook recommends a one-year waiting period for individuals who suffer a TIA. (Ex. 2B, Medical Examiner Handbook, p. 166).

32. The Handbook recommends that an individual diagnosed with a "stroke with risk for seizures" complete a minimum waiting period of five years seizure-free. (Ex. 2B, Medical Examiner Handbook, p. 166, 160).

**F. Union Pacific Applies Restrictions Based on Dr. Wilson's Conclusions and FMCSA Guidelines**

33. Based on Witchet's medical documentation of his clinical symptoms and medical records, and confirmed by Dr. Wilson's report, Union Pacific concluded that Witchet suffered a stroke in the cortical / subcortical area of the parietal lobe of his brain. (Ex. 1A, Witchet Dep. 131:12-15; Ex. 3A, UP_Witchet_000323-24; Ex. 2, Dr. Holland Dec. ¶ 6; Ex. 3, Dr. Charbonneau Dec. ¶ 7).

34. The location of a stroke affects the duration of the increased risk for future neurological events such as seizures. (Ex. 3, Dr. Charbonneau Dec. ¶ 7). Indeed, FMCSA guidelines note that the "[r]isk for complicating seizures is associated with the location of the lesions." (Ex. 2B, Medical Examiner Handbook, p. 160; 143).

35.     The FMCSA Medical Examiner Handbook states that cortical and subcortical deficits correlate with an increased risk for seizures, while cerebellum and brainstem vascular lesions do not. (Ex. 2B, Medical Examiner Handbook, p. 160).

36.     The FMCSA thus recommends different waiting periods for strokes based on their location:

- Minimum — 1 year if not at risk for seizures (cerebellum or brainstem vascular lesions)

- Minimum — 5 years if at risk for seizures (cortical or subcortical deficits)

(Ex. 2B, Medical Examiner Handbook, p. 160).

37.     After receiving Dr. Wilson's report, Union Pacific issued functional work restrictions that prohibited Witchet from:

a.  Operating company vehicles/on-track or mobile equipment/forklifts;

b.  Operating cranes, hoists or machinery;

c.  Working on or near moving trains, freight cars or locomotives;

d.  Working at unprotected heights over four feet; and

e.  Working on 1-man or 2-man gangs.

(Ex. 1A, Witchet Dep. 131:24:-132:11; Ex. 3A, UP_Witchet_000323-24). These restrictions were to be in place for five years. (Ex. 1A, Witchet Dep. 131:16-23). Union Pacific informed Witchet that it would reassess the restrictions if he remained neurologically stable and seizure-free for five years. (Ex. 1A, Witchet Dep. 131:20-23).

38.     Union Pacific issued the restrictions for five years based on Dr. Wilson's conclusion that Witchet suffered a "parietal stroke" and the corresponding FMCSA guidelines. (Ex. 2A, UP_Witchet_000294; Ex. 2, Dr. Holland Dec. ¶7; Ex. 3, Dr. Charbonneau Dec. ¶¶ 8-9).

39. Although Dr. Wilson's initial report noted that FMCSA guidance documents recommend a "one-year" restriction from driving commercial vehicles, Dr. Charbonneau recognized this as an inadvertent typo since the Medical Examiner Handbook recommends a five-restriction for individuals who suffer a stroke in the cortical / subcortical areas of the brain. (Ex. 3, Dr. Charbonneau Dec. ¶ 8). A few days after receiving Dr. Wilson's report, Dr. Charbonneau issued restrictions for five years based on the FMCSA Medical Examiner Handbook. (Ex. 3, Dr. Charbonneau Dec. ¶ 8; Ex. 3A, UP_Witchet_000323-24).

40. Dr. Charbonneau wrote that Witchet had a "parietal stroke" that "will require a 5 year period of sudden incapacitation restrictions." (Ex. 3A, UP_Witchet_000323).

**F. Union Pacific Agrees to Reevaluate Witchet and Dr. Wilson Confirms His Diagnosis of Stroke**

41. Union Pacific later agreed to reconsider the information it obtained during the FFD process. (Ex. 1A, Witchet Dep. 139:12-16). As part of its reconsideration, Union Pacific instructed Witchet to obtain his CT and MRI images for an independent review. (Ex. 1A, Witchet Dep. 139:17-24; 140:3-8; 178:12-23). Witchet did so and sent the imaging studies to both Union Pacific and Dr. Rehman. (Ex. 1A, Witchet Dep. 141:18-22; 182:3-7). Union Pacific then sent them to Dr. Wilson for review. (Ex. 3, Dr. Charbonneau Dec. ¶ 10).

42. Dr. Wilson reviewed the images and issued an addendum report on or about August 15, 2016. (Ex. 2C, UP_Witchet_00108-11, authenticated at Holland Dec. ¶ 8). In his addendum report, Dr. Wilson noted that he had not seen the imaging studies at the time of his initial report. (Ex. 2C at UP_Witchet_000108).

43.     Dr. Wilson concluded in the addendum report that Witchet suffered a "confirmed stroke." (Ex. 2C at UP_Witchet_000109). Dr. Wilson also concluded that "based on the recommendations of the FMCSA, there is a risk for seizures for five years, and restrictions for this period of time are appropriate. I think the stroke represents a fixed structural lesion which poses risk for future seizures for five years." (Ex. 2C at UP_Witchet_000110).

44.     Witchet visited Dr. Rehman in August 2016. (Ex. 1A, Witchet Dep. 191:6-12). At this visit, Dr. Rehman reviewed Witchet's October 16 MRI image for the first time. (Ex. 1L, Dr. Rehman Dep. 28:4-7, 62:23-63:10; Witchet Dep. Ex. 29, at WITCHET0000118, authenticated at Ex. 1A, Witchet Dep. 191:6-9, attached here as Ex. 1G). Upon review of the MRI, Dr. Rehman concluded that Witchet suffered a stroke. (Ex. 1L, Rehman Dep. 62:23-63:10; 64:24-65:8).[5]

45.     In September 2016, Union Pacific informed Witchet that based on Dr. Wilson's reports, it decided to deny his request for reconsideration of the restrictions. (Ex. 1A, Witchet Dep. 194:19-22; 195:19-196:3; Ex. 3A at UP_Witchet_000303). Dr. Holland told Witchet that Union Pacific would reconsider the restrictions in October 2020. (Ex. 1A, Witchet Dep. 197:1-5).

## G.     Union Pacific Pays for a Vocational Consultant to Help Witchet Find Additional Opportunities

46.     Union Pacific sent Witchet a letter advising him of his options following the determination that he was under restrictions for five years. (Witchet Dep. Ex. 23,

---

[5] Dr. Rehman previously provided a note to Union Pacific on February 12, 2016 clearing Witchet to return to work without restriction. (Ex. 1L, Rehman Dep. 60:2-5). But Dr. Rehman had not seen Witchet's hospital MRI at that point and is unfamiliar with the FMCSA's recommendations on restrictions for individuals who suffer a stroke. (Ex. 1L, Rehman Dep. 49:20-50:6; 50:19-22; 15:9-23). Dr. Rehman's clearance is further discredited by Witchet's retained expert, Dr. Trangle, who opines that Union Pacific should have restricted Witchet for one year. (Ex. 1I, Dr. Trangle Report, p. 12-13).

UP_Witchet_000434-440, authenticated at Ex. 1A, Witchet Dep. 156:1-7 and attached as Ex. 1H). The letter instructed Witchet to call Union Pacific's Disability Management Department for assistance on his vocational future. (Ex. 1H, UP_Witchet_000435). Union Pacific continued to send Witchet job leads and identified positions for him to which he applied. (Ex. 1A, Witchet Dep. 176:9-11; 177:8-10).

47.     Union Pacific connected Witchet with one of the railroad's "Return to Work Managers," Pauline Weatherford, who encouraged and helped Witchet apply for other positions within the company that were suitable for his restrictions. (Ex. 1A, Witchet Dep. 159:4-18; 160:15-17). Witchet was unable to locate any Union Pacific jobs for which he was qualified and that were compatible with his restrictions. (Ex. 1A, Witchet Dep. 160:15-161:1).

48.     Union Pacific also paid for an independent vocational rehabilitation consulting firm to work with Witchet. (Ex. 1A, Witchet Dep. 233:20-234:1). The rehabilitation firm helped Witchet locate a job, reviewed his resume, offered free computer classes, and provided information on job leads and job fairs. (Ex. 1A, Witchet Dep. 230:6-19; 232:21-25).

49.     Union Pacific did not terminate Witchet's employment. (Ex. 4, Ross Dec. ¶ 4). Union Pacific is prepared to re-evaluate Witchet's restrictions when they expire in 2020 and perform a fitness-for-duty examination, potentially returning him to work. (Ex. 4, Ross Dec. ¶ 4).

### III.   ARGUMENT AND AUTHORITIES

**A.   Standard of Review**

Summary judgment "is appropriate when the evidence viewed in the light most favorable to the nonmoving party, demonstrates that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law." *Hanger v. Lake County*, 390 F.3d 579, 582 (8th Cir. 2004). On a motion for summary judgment, "district courts should not 'treat [employment] discrimination [cases] differently from other ultimate questions of fact.'" *Torgerson v. City of Rochester*, 643 F.3d 1031, 1043 (8th Cir. 2011). Summary judgment is proper when a plaintiff fails to establish any element of his prima facie case under the ADA. *See Kellogg v. Union Pac. R.R.,* 233 F.3d 1083, 1086 (8th Cir. 2000). Under this standard, there are no genuine issues of material fact and Union Pacific is entitled to judgment as a matter of law on Witchet's claims.

**B.   Union Pacific Is Entitled to Summary Judgment on Witchet's ADA Disparate Treatment Claim**

Witchet alleges disability discrimination under the ADA. (Filing No. 1, Count I). Witchet has no direct evidence of disparate treatment,[6] so his claim falls under the burden-shifting analysis set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Oehmke v. Medtronic, Inc.*, 844 F.3d 748, 755 (8th Cir. 2016). Witchet bears the burden of establishing his *prima facie* case. *Id.* The burden of production then shifts to Union Pacific to articulate a legitimate, nondiscriminatory reason for its actions. *Id.* If

---

[6] Direct evidence of discrimination is evidence that "establishes a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated the employer's decision. Direct evidence does not include stray remarks in the workplace, statements by nondecisionmakers, or statements by decision-makers unrelated to the decisional process itself." *Twymon v. Wells Fargo & Co.*, 462 F.3d 925, 933 (8th Cir. 2006) (internal quotations and citations omitted).

Union Pacific articulates such a reason, the burden returns to Witchet to show Union Pacific's proffered reason is pretextual. *Id.*

To establish a *prima facie* case for discrimination, Witchet must show that he: (1) is disabled under the ADA; (2) is qualified to carry out the essential functions of his position with or without a reasonable accommodation; and (3) suffered an adverse employment action under circumstances giving rise to an inference of unlawful discrimination. *Lowery v. Hazelwood School Dist.*, 244 F.3d 654, 657 (8th Cir. 2001). If Witchet fails to establish any element of his prima facie case, summary judgment is proper. *Kellogg v. Union Pac. R. Co.,* 233 F.3d 1083, 1086 (8th Cir. 2000).

### 1. Witchet is Not Disabled Under the ADA

An individual is "disabled" under the ADA if the person: (a) has a physical or mental impairment that substantially limits one or more major life activities; (b) has a record of such an impairment; or (c) is regarded as having such an impairment. 42 U.S.C. § 12102(1).

### i. Witchet Does Not Have an "Actual Disability"

Witchet admits that he has no physical condition that is a disability. (Ex. 1A, Witchet Dep. 53:23-54:3). Witchet also admits he is not limited in any major life activities. (Ex. 1A, Witchet Dep. 54:9-19). He therefore does not have an "actual disability" under 42 U.S.C. § 12102(1)(a).[7]

---

[7] Witchet claims in discovery responses that he was disabled during his single (alleged) transient ischemic attack. (Ex. 1J, p. 4, ¶ 5). This one event is not a disability because it is not episodic nor does it substantially limit any major life activity. 42 U.S.C. 12102(4)(D); (Ex. 1A, Witchet Dep. 54:9-19). 29 C.F.R. § Pt. 1630, App. ("[T]he duration of an impairment is one factor that is relevant in determining whether the impairment substantially limits a major life activity. Impairments that last only for a short period of time are typically not covered, although they may be covered if sufficiently severe."). According to Witchet's own expert, the neurological issue resolved within "several hours without any neurological impairment at all." (Ex. 1I, Dr. Trangle Report, p. 11).

Since Witchet has no "actual" disability, he relies exclusively on the § 12102(1)(c) "regarded as" prong. (Ex. 1A, Witchet Dep. 54:4-8; 57:6-9: 200:8-11). To establish that he was "regarded as" disabled, Witchet must show that Union Pacific subjected him to an adverse action "because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity." *Fischer v. Minneapolis Pub. Sch.,* 792 F.3d 985, 988 (8th Cir. 2015) (citing 42 U.S.C. § 12102(1), (3)(A)). The "regarded as" prong combats "unfounded concerns, mistaken beliefs, fears, myths, or prejudice about disabilities." 29 C.F.R. § Pt. 1630, App. Even after the ADA Amendments Act of 2008 (ADAAA) broadened the scope of the "regarded as" prong, it is still rooted in concerns about myths or stereotypes associated with disabled individuals. *Eggering v. MHP, Inc.,* No. 4:10CV01794 AGF, 2012 WL 13055493, at *4 (E.D. Mo. Mar. 13, 2012); *Neely v. Benchmark Family Servs.,* 640 F. App'x 429, 436 (6th Cir. 2016).

Witchet alleges that Union Pacific "regarded him" as disabled by mistakenly concluding that he had a stroke. (Ex. 1A Witchet Dep. 54:4-8; 57:6-9; 200:8-11). But "[r]estrictions based upon the recommendations of physicians are not based upon myths or stereotypes about the disabled and thus do not demonstrate a perception of disability." *Pittari v. Am. Eagle Airlines, Inc.,* 468 F.3d 1056, 1063 (8th Cir. 2006). An employer's reliance on a physician's findings cuts against a "regarded as" claim. *Nuzum v. Ozark Auto. Distributors, Inc.,* 320 F. Supp. 2d 852, 871 (S.D. Iowa 2004), *aff'd,* 432 F.3d 839 (8th Cir. 2005). This is true even after the ADAAA. *Watt v. City of Crystal*, No. 14-CV-3167 (JNE/JJK), 2015 WL 7760166, at *5 (D. Minn. Dec. 2, 2015) (recognizing

that restrictions are not grounded in myths or stereotypes when based on the recommendations of physicians). In *Wurzel v. Whirlpool Corp.,* the court held that an employer did not "regard" plaintiff as disabled under the ADAAA when it prohibited him from operating company vehicles or machinery based on the recommendations of the company's doctor and an independent cardiologist who shared bona fide safety concerns over plaintiff's unpredictable chest spasms. No. 3:09CV498, 2010 WL 1495197, at *5-7, 9-10 (N.D. Ohio Apr. 14, 2010), *aff'd,* 482 F. App'x 1 (6th Cir. 2012).

Witchet cannot show that Union Pacific "regarded him" as disabled when his hospital physicians diagnosed him with a stroke and Dr. Wilson later confirmed this diagnosis in an independent review. (Ex. 1C at UP_Witchet_000384; Ex. 2A, UP_Witchet_000294). Even Witchet's own neurologist, Dr. Rehman, eventually found that Witchet had a stroke. (Ex. 1L, Dr. Rehman Dep. 62:23-63:10). Union Pacific reasonably relied on Witchet's hospital records and Dr. Wilson's reports to conclude that Witchet had a parietal stroke, then applied FMCSA guidance and restricted Witchet from driving commercial vehicles for five years. (Ex. 2B, Medical Examiner Handbook, p. 160; Ex. 2, Dr. Holland Dec. ¶¶ 6-7; Ex. 3, Dr. Charbonneau Dec. ¶¶ 7-8). Dr. Wilson also recommended the five-year restriction. (Ex. 2C at UP_Witchet_000110). Witchet's restrictions were thus based on the findings and recommendations of various physicians and the FMCSA's clear guidance—not unfounded myths, stereotypes or prejudices.

Three additional facts undercut Witchet's "regarded as" claim. First, Union Pacific encouraged and helped Witchet find a job compatible with his restrictions. (Ex. 1A, Witchet Dep. 159:4-18; 160:15-17). *Fischer*, 792 F.3d at 989-90 ("That [employer] did not regard [employee] as having a physical impairment is further supported by the fact

that [employer] was willing to let [employee] apply for other positions…"); *Nuzum*, 320 F. Supp. 2d at 872 ("The fact that [employer] encouraged [employee] to look and apply for other positions that were within his lifting restrictions tends to further establish that [employer] did not regard [employee] as disabled.").

Second, Union Pacific will reconsider Witchet's restrictions after the five-year period and may allow him to return pending a fitness-for-duty examination. (Ex. 4, Ross Dec. ¶ 4). *Fischer*, 792 F.3d at 90 (noting that the employer did not regard employee as disabled when it was willing to let employee reapply for his position at a later date). Finally, Witchet's own expert, Dr. Trangle, agrees it was appropriate for Union Pacific to apply *some* waiting period—he just disagrees about the length because he disagrees with the underlying diagnosis. According to Dr. Trangle, Witchet sustained a TIA rather than a stroke, and Union Pacific should have held him out of service for one year. (Ex. 1I, Dr. Trangle Report, p. 12-13). A one-year waiting period following a TIA adheres to the FMCSA's recommendation. (Ex. 2B, Medical Examiner Handbook, p. 166).

Witchet cannot show that Union Pacific "regarded" him as disabled when it applied FMCSA guidelines that explicitly recommend an individual who suffers a stroke like Witchet's should not drive commercial trucks for five years. These guidelines were not based on any unfounded fear, myth, or prejudice, but the conclusions of Witchet's treating hospital physicians and Dr. Wilson, all of whom diagnosed Witchet with a stroke.

2. <u>Witchet is Temporarily Not Qualified Under the ADA Because He Cannot Safely Perform the Essential Functions of His Position</u>

To survive summary judgment, Witchet must also show that he was qualified to perform the essential functions of his position. *Otto v. City of Victoria*, 685 F.3d 755, 758

(8th Cir. 2012). Since employers need not provide accommodations when the employee is merely "regarded as" disabled, the inquiry under this step does not consider the effect of any possible accommodations. *Hanson v. N. Pines Mental Health Ctr., Inc.,* No. CV 16-2932 (DWF/LIB), 2018 WL 1440333, at *8 (D. Minn. Mar. 22, 2018) (citing 42 § U.S.C. 12201(h)). Witchet is temporarily not qualified to be a Truck Operator because under FMCSA guidelines he cannot safely operate commercial vehicles for five years.

i. <u>Safely Driving Trucks and Satisfying FMCSA Medical Requirements are Essential Functions of the Truck Operator Position</u>

Driving trucks is the "fundamental job duty" of a Truck Operator, and the reason the position exists. 29 C.F.R. § 1630.2(n)(1)-(2). Witchet spent about 50 percent of his time driving trucks—more than enough for a job function to be essential. (Ex. 1A, Witchet Dep. 42:16-43:3); *Minnihan v. Mediacom Commc'ns Corp.,* 779 F.3d 803, 812 (8th Cir. 2015). Of course, *safe* driving is essential as commercial drivers must operate "in a way that does not threaten the safety of his passengers or of other motorists." *Myers v. Hose*, 50 F.3d 278, 282 (4th Cir. 1995). Witchet's job description identifies as essential functions: (1) following company and industry safety rules, practices and procedures; and (2) ensuring compliance with all railroad rules and regulations for safety to prevent accidents. (Ex. 1B at UP_Witchet_00453, 455). Witchet acknowledged that safety was a "very important" part of his job. (Ex. 1A, Witchet Dep. 51:11-14).

Driving safely requires Truck Operators to satisfy the medical qualifications set forth by the FMCSA, an agency of the DOT.[8] (Ex. 1B at UP_Witchet_000463; 49 C.F.R. §§ 390.3(a), 390.5). Witchet does not dispute that the FMCSA medical requirements

---

[8] The FMCSA is in charge of exercising the DOT's authority to establish medical standards for operators of commercial motor vehicles. *Owner-Operator Indep. Drivers Ass'n v. United States Dep't of Transportation*, 878 F.3d 1099, 1100 (8th Cir. 2018) (citing 49 § USC 31149(c)(1)(A).

apply to him. (Ex. 1A, Witchet Dep. 49:17-50:2). This Court recognizes that compliance with DOT regulations is essential to the role of a commercial truck driver. *Clark v. Lyman-Richey Corp.,* No. 8:06CV669, 2008 WL 1733603, at *7 (D. Neb. Apr. 10, 2008) (J. Batallion). *See also Albertson's, Inc. v. Kirkingburg*, 527 U.S. 555, 570 (1999) (recognizing an employer's "unconditional obligation to follow [FMCSA] regulations and its consequent right to do so.").

## ii. Witchet is Temporarily Not Qualified Under the ADA Because He Cannot Comply With FMCSA Standards

The FMCSA recommends a five-year restriction on driving commercial trucks for individuals who suffer a stroke in the same area of the brain where Witchet's occurred. He is thus not qualified under the ADA during this five-year timeframe.

Federal law prohibits a person from driving commercial trucks unless "physically qualified" to do so under regulatory medical standards. 49 C.F.R. §§ 391.11(a); (b)(4); 49 C.F.R. §§ 391.41(b). Commercial drivers must be able to satisfy the DOT's physical qualification standards to be qualified under the ADA. *Albertson's*, 527 U.S. at 573-74 (citing ADA legislative history); *Knutson v. Schwan's Home Serv., Inc.*, 711 F.3d 911, 915 (8th Cir. 2013). An individual with a condition that is "likely to cause loss of consciousness or any loss of ability to control a commercial motor vehicle" is not physically qualified. 49 C.F.R. §§ 391.41(b)(7). Since the regulations do not elaborate on what constitutes that condition, the FMCSA Medical Examiner Handbook provides guidance to assist examiners determine a driver's medical fitness for duty. (Ex. 2B, Medical Examiner Handbook, p. 51). These guidelines are "intended as best practices for medical examiners" based on a systematic review of scientific literature, expert analysis of data, and recommendations from Medical Expert Panels. (Ex. 2B, Medical

Examiner Handbook, p. 51). Employers may require and enforce more stringent safety requirements than those in the FMCSA regulations. 49 C.F.R. § 390.3(d).

The Medical Examiner Handbook explains that the risk for seizures following a stroke is linked to its location in the brain. (Ex. 2B, Medical Examiner Handbook, p. 160). The Handbook explicitly states that "cortical and subcortical deficits are associated with an increased risk for seizures." (Ex. 2B, Medical Examiner Handbook, p. 160; p. 143). The FMCSA therefore recommends a five-year waiting period for individuals who suffer this kind of stroke due to the corresponding risk of seizures. (Ex. 2B, Medical Examiner Handbook, p. 160, 166).

Courts have repeatedly held that drivers who cannot comply with FMCSA guidance are not qualified under the ADA. In *Tate v. Farmland Indus., Inc.*, 268 F.3d 989, 994 (10th Cir. 2001), the Tenth Circuit declared that "the views of an agency such as DOT implementing a regulatory scheme designed to ensure the safety of our nation's highways constitute a body of experience and informed judgment to which employers may properly resort for guidance." (citations and quotations omitted). The court had "little difficulty" concluding that employers may rely on a reasonable interpretation of the DOT's Medical Advisory Criteria to establish the physical requirements for commercial drivers. *Id.* at 995. Even though a medical examiner certified the driver as physically qualified to operate a commercial vehicle, the court affirmed that he was not ADA-qualified because he could not satisfy the DOT's nonbinding Medical Advisory Criteria. *Id.* at 995-96.

In *Hurd v. Cardinal Logistics Mgmt. Corp.*, No. 7:17-CV-00319, 2018 WL 4604558, at *5 (W.D. Va. Sept. 25, 2018), the court acknowledged the FMCSA Medical

Examiner Handbook and explained that "while the advisory criteria are merely advisory, the advisory nature does not defeat the conclusion that [the driver] was not qualified." The court determined that "although [the driver] has obtained a medical examiner's certification, it is without dispute that he fails to meet the requirements set forth in the advisory criteria and that [the employer] may rely on these requirements under DOT's standards." *Id.* at *6.

Courts have used this same reasoning time and again. *See Anderson v. Greenville Cty. Sch. Dist.,* No. 6:12-CV-03069-JDA, 2014 WL 12770232, at *3 (D.S.C. Sept. 17, 2014) (finding plaintiff with a defibrillator was not qualified to be a bus driver when he could not satisfy the DOT's medical standards even though employer was not legally required to impose them); *Richardson v. Mabus*, 203 F. Supp. 3d 86, 155 (D. Me. 2016) (determining plaintiff was not qualified and noting that guidance from the FMCSA Medical Advisory Board is "persuasive"); *Foreman v. Norfolk S. Corp.,* No. 5:15-CV-140 (CAR), 2017 WL 1217174, at *6 (M.D. Ga. Mar. 31, 2017) (citing with approval the FMCSA Medical Examiner Handbook's recommended restriction for individuals who suffer a cerebellar vascular stroke).

Under FMCSA guidance, Witchet is temporarily not physically qualified to operate commercial trucks. Because of the corresponding risk of seizures, the FMCSA recommends a minimum waiting period of five-years for drivers who have "cortical or subcortical deficits." (Ex. 2B, Medical Examiner Handbook, p. 160, 166). This is precisely the location where Witchet's stroke occurred, as his own neurologist confirmed. (Ex. 1L, Dr. Rehman Dep. 63:11-15; Ex. 2, Dr. Holland Dec. ¶ 6). Witchet's hospital treatment team diagnosed him with an "Acute Cerebrovascular Accident" (i.e., a

stroke) based on an MRI finding, and Dr. Wilson later confirmed that Witchet sustained a stroke. (Ex. 1C at UP_Witchet_000384; Ex. 2A, UP_Witchet_000294).

Union Pacific was "entitled to rely on and act upon" the findings of both Witchet's hospital treatment team and Dr. Wilson to reasonably conclude that Witchet suffered a parietal stroke in the cortical area of his brain. *Alexander v. Northland Inn,* 321 F.3d 723, 727 (8th Cir. 2003). Employers of commercial drivers may "rely on medical determinations made by medical professionals, including, of course, the plaintiff's own physicians." *Green v. Pace Suburban Bus*, No. 02 C 3031, 2004 WL 1574246, at *8 (N.D. Ill. July 12, 2004). Union Pacific then applied the FMCSA's clear instruction and restricted Witchet from driving commercial vehicles for five years. Dr. Wilson also recommended this restriction. (Ex. 2C at UP_Witchet_000110). *Otto v. City of Victoria*, 834 F. Supp. 2d 912, 917 (D. Minn. 2011), *aff'd*, 685 F.3d 755 (8th Cir. 2012) ("The ADA does not force employers to permit employees to perform functions restricted by a physician."). Witchet therefore cannot meet his burden to show he is qualified under the ADA because he cannot satisfy the FMCSA's medical guidance. *E.g., Tate* 268 F.3d at 995-96.

This case is like *Clark*, where despite conflicting opinions over whether the plaintiff had epilepsy, this Court still determined that the medical evidence along with the DOT's regulatory medical standards meant the plaintiff was not qualified under the ADA. *Clark*, 2008 WL 1733603 at *7. Although the FMCSA's advisory standards apply here, the rationale is the same: the medical evidence shows Witchet had a cortical stroke and the FMCSA recommends a corresponding five-year waiting period. Union Pacific could not simply disregard the medical evidence or the FMCSA and knowingly expose itself to

the very risk the FMCSA aims to prevent. *Rizzo v. Children's World Learning Centers, Inc.,* 173 F.3d 254, 268 (5th Cir. 1999) ("There is no evidence that Congress intended to place an employer in such a Catch–22 situation—either discriminate or endanger your business and the safety of others."). As a result, Witchet is temporarily not qualified under the ADA because he cannot perform *the* essential function of his job.

### 3. Witchet Cannot Show Circumstances Giving Rise to an Inference of Discrimination

Witchet fails to satisfy the third prong of his *prima facie* case because he lacks evidence of an inference of discrimination. Such inference may arise if the employer failed to follow its own policies, treated similarly situated employees more favorably, or shifted its explanation for the employment decision. *Young v. Builders Steel Co.,* 754 F.3d 573, 578 (8th Cir. 2014). Witchet has no such evidence and cannot identify any similarly situated individuals who were treated more favorably. (Ex. 1A, Witchet Dep. 199:19-200:1).

Union Pacific instead made a reasoned determination rooted in safety and informed by the medical evidence. *E.E.O.C. v. Schneider Nat., Inc.,* 481 F.3d 507, 510 (7th Cir. 2007) (affirming dismissal in favor of trucking company that disqualified driver even though his condition did not prevent him from satisfying DOT qualification standards because an employer "is entitled to determine how much risk it too great for *it* to be willing to take.") (emphasis in original). The court in *Schneider* described the potentially calamitous liability for allowing a driver to remain behind the wheel despite knowledge of risk—even a slight one—that the driver may become suddenly incapacitated. *Id.* And unlike *Schneider*, Witchet's cortical stroke and related seizure risk *is* temporarily disqualifying under the FMCSA's recommendation. As explained below,

legitimate safety concerns and reliance on both professional medical findings and FMCSA guidance justify Witchet's restrictions.

### 4.   Witchet's Temporary Restrictions were Based on Legitimate, Nondiscriminatory Reasons that Were Not Pretextual

Even if Witchet could establish a *prima facie* case, his claim still fails because Union Pacific has a legitimate reason for the temporary restrictions. Union Pacific may rely on the FMCSA's regulations and recommendations as a nondiscriminatory basis for its actions. *Parker v. Crete Carrier Corp.,* 158 F. Supp. 3d 813, 824 (D. Neb.), *aff'd sub nom.* 839 F.3d 717 (8th Cir. 2016).

Reliance on DOT regulations is not only a legitimate reason, but a complete defense to Witchet's claim. *Murphy v. United Parcel Serv., Inc.*, 946 F. Supp. 872, 884 (D. Kan. 1996) *aff'd* 527 U.S. 516 ("Because there is no evidence demonstrating that UPS' reliance on the DOT regulations was pretextual, and because the qualification standard was clearly job related, UPS' reliance on the DOT regulations is a defense to [plaintiff's] ADA claims."); *Talbot v. Maryland Transit Admin.,* No. CIV.A. WMN-12-1507, 2012 WL 5839945, at *2 (D. Md. Nov. 15, 2012) ("[C]ourts have consistently held that an employment action based upon an employee's or prospective employee's inability to satisfy DOT medical standards does not violate disability discrimination laws."). Employers may also rely on the reasonable medical judgments by healthcare professionals. *Denson v. Steak 'n Shake,* No. 4:16 CV 1266 CDP, 2017 WL 6316723, at *3 (E.D. Mo. Dec. 11, 2017), *aff'd sub nom.* 910 F.3d 368 (8th Cir. 2018).

Reliance on FMCSA criteria and professional medical opinions is especially appropriate in the safety-critical context of a commercial driver position. In *Clark*, this Court found that the employer articulated a legitimate reason for discharging a driver—

despite conflicting medical evidence—based on a physician's findings and a reasonable belief that the driver could not comply with DOT regulations. *Clark*, 2008 WL 1733603 at *8. In *Rice v. Genova Prod., Inc.,* 978 F. Supp. 813 (N.D. Ind. 1997), a commercial driver had an episode of lost consciousness. The driver's physician cleared him for work, while the company's doctor determined he was not medically fit to return. The court dismissed driver's ADA claim, reasoning that the employer had a "right to rely" on the company doctor's conclusion that the driver could not meet DOT regulations. *Rice*, 978 F. Supp. at 821. "It matters not the basis on which that opinion was formed, only that it was communicated to [employer] and the company relied on it in making its employment decisions regarding [plaintiff]." *Id.* The court found it irrelevant that the company doctor never examined the plaintiff and that later medical evidence proved his opinion incorrect. *Id.*

Union Pacific's reliance on the emergency room diagnosis, Dr. Wilson's reports, and the FMCSA recommendation was similarly legitimate and nondiscriminatory. After the initial diagnosis of an "acute CVA" (i.e., stroke) coupled with Witchet's symptoms, Union Pacific requested that Dr. Wilson review Witchet's records. Dr. Wilson confirmed that Witchet suffered a parietal stroke. (Ex. 2A, UP_Witchet_000294). Based on the location of the stroke, Union Pacific then applied the FMCSA's five-year recommendation. (Ex. 3, Dr. Charbonneau Dec. ¶¶ 7-9; Ex. 3, Dr. Holland Dec. ¶¶ 6-7; Ex. 2B, Medical Examiner Handbook, p. 160). Later, after Dr. Wilson examined Witchet's MRI images, he confirmed the stroke and recommended a five-year restrictive period (Ex. 2C at UP_Witchet_000110).

Even if Dr. Wilson was "wrong" in his diagnosis, Union Pacific may still rely on it without violating the ADA. *Crocker v. Runyon*, 207 F.3d 314, 319 (6th Cir. 2000) ("Even if the earlier medical opinions [of two private physicians] were demonstrably flawed, the [employer's] reasonable reliance upon them is not discriminatory."). Further, Union Pacific was entitled to independently rely on Drs. Charbonneau and Holland, both of whom reasonably concluded that Witchet had a stroke. *Rice*, 978 F. Supp. at 821 (declaring that a company may rely on its own doctor's opinion about whether the driver was medically qualified under DOT regulations).

Witchet's retained expert, Dr. Trangle, opined that Witchet had a TIA (not a stroke) and Union Pacific should have imposed a one-year as opposed to a five-year driving restriction. (Ex. 1I, Dr. Trangle Report, p. 12-13). A one-year restriction comports with the FMCSA's recommendation for a TIA. (Ex. 2B, Medical Examiner Handbook, p. 166). But Witchet cannot create a fact dispute by trumpeting an expert retained after the fact and whose opinion contradicts that of Witchet's own neurologist and hospital treating physicians, all of whom concluded that Witchet had a stroke. The ADA does not require a court or jury to decide which expert is "correct" about the underlying diagnosis.

Courts may not second-guess the employer's decision based on allegedly conflicting medical evidence. *Wurzel*, 2010 WL 1495197 at *10. "Neither [the court] nor a jury is charged with, or has the authority to assess *de novo* which medical judgment is more likely accurate." *Id.* "An employer's determination that a person cannot safely perform his job functions is objectively reasonable when the employer relies upon a medical opinion that is itself objectively reasonable," even if it conflicts with other

medical opinions. *Michael v. City of Troy Police Dep't,* 808 F.3d 304, 307 (6th Cir. 2015). "[T]he question is thus not whether [the employer's decision] was correct measured by 'objective' standards. What is relevant is that [the employer], in fact, acted on its **good faith belief about plaintiff's condition based upon the medical professional's opinion."** *Zulueta v. United States*, No. 3:08-CV-246, 2009 WL 1651172, at *9 (M.D. Tenn. June 10, 2009) (emphasis in original). And here, the question is not whether Union Pacific can definitely "prove" Witchet had a stroke (any more than Witchet must "prove" he had a TIA), it is instead whether Union Pacific reasonably relied on Witchet's emergency room diagnosis, the FMCSA's recommendation, and Dr. Wilson's reports. It did.

Finally, Witchet cannot show that Union Pacific's decision was pretext. To do so, Witchet must present sufficient evidence to demonstrate both that Union Pacific's articulated reason for imposing the five-year restrictions was false and that discriminatory animus underlies the neutral explanation. *Wilking v. County of Ramsey*, 153 F.3d 869, 874 (8th Cir.1998). Witchet must produce "substantial evidence of discrimination" because "evidence of pretext is viewed in the light of [an employer's] legitimate, non-discriminatory explanation." *Jones v. United Parcel Serv., Inc.*, 461 F.3d 982, 992 (8th Cir. 2006). The issue is not whether Union Pacific's decision was unwise, but whether its stated reason for imposing the restrictions was false so that it is only mere pretext for discrimination. *McNary v. Schreiber Foods, Inc.*, 535 F.3d 765, 769 (8th Cir. 2008).

Union Pacific's reliance on the emergency room records, Dr. Wilson, or the FMCSA's recommendations was not pretext. An employer's legitimate concern about an

employee's ability to safely perform essential job functions is not pretext for discrimination. *Clark*, 2008 WL 1733603, at *8. Union Pacific simply applied the FMCSA's clear guidance based on the objective medical evidence it had available. Even if Witchet could somehow show that the diagnosis in Dr. Wilson's reports was "demonstrably flawed," Union Pacific's reasonable reliance on them is not pretext designed to mask discriminatory intent. *McDonald v. Webasto Roof Sys., Inc.,* 570 F. App'x 474, 477 (6th Cir. 2014). Witchet's claim for ADA disparate treatment under the ADA fails as a matter of law.

### C. Union Pacific Is Entitled to Summary Judgment on its Direct Threat Defense

For many of the same reasons that Witchet cannot show he is ADA-qualified, Union Pacific can establish its direct threat defense. (Filing No. 16, p. 6, ¶ 11). Summary judgment is warranted when an employee poses "a direct threat to the health or safety of other individuals in the workplace." *EEOC v. Wal-Mart Stores, Inc.,* 477 F.3d 561, 571 (8th Cir. 2007) (citing 42 U.S.C. § 12113(b)). This determination is based on an individualized assessment of the person's ability to work safely as well as a reasonable medical judgment relying on current medical knowledge and the best available objective evidence. 29 C.F.R. § 1630.2(r). Factors considered are: (1) the duration of the risk; (2) the nature and severity of the potential harm; (3) the likelihood that the potential harm will occur; and (4) the imminence of the potential harm. (*Id*). In the commercial driving context, "a relatively small risk is unreasonable and unacceptable." *Burton v. Metro. Transp. Auth.,* 244 F. Supp. 2d 252, 263 (S.D.N.Y. 2003).

Whether an employer properly determined that a person poses a direct threat depends on "the objective reasonableness of [the employer's] actions." *Michael*, 808

F.3d at 307 (citing *Bragdon v. Abbott,* 524 U.S. 624, 650 (1998)). *See also Jarvis v. Potter*, 500 F.3d 1113, 1122 (10th Cir. 2007) (reasoning that in a direct threat case, "the fact-finder's role is to determine whether the employer's decision was objectively reasonable."). An employer's determination that a person cannot safely perform his job functions is objectively reasonable when the employer relies on a medical opinion that is itself objectively reasonable. *Michael*, 808 F.3d at 307 (citations omitted). A medical opinion may conflict with other medical opinions and still be objectively reasonable. *Id*.

Dr. Wilson reviewed Witchet's emergency room records, symptoms and MRI images to conclude that Witchet suffered a stroke. (Ex. 2A, UP_Witchet_000294; Ex. 2C, UP_Witchet_000110). Dr. Wilson also advised Union Pacific that Witchet had a "moderate to high risk for future sudden incapacitation." (Ex. 2A, UP_Witchet_000294). He reiterated in his addendum report that "based on the recommendations of the FMCSA, there is a risk for seizures for five years." (Ex. 2C, UP_Witchet_000110). Based on the location of Witchet's stroke, Dr. Wilson recommended a five-year commercial driving restriction in compliance with the FMCSA. (Ex. 2C, UP_Witchet_000110). Union Pacific's reliance on Dr. Wilson's objectively reasonable conclusion that Witchet had a stroke coupled with the FMCSA's instruction establishes its direct threat defense. *Michael*, 808 F.3d at 307.

In addition to Dr. Wilson, Union Pacific's Chief Medical Officer (Dr. Holland) and Assistant Medical Director (Dr. Charbonneau) both determined based on the medical evidence that Witchet had a stroke. Union Pacific had a right to rely on those conclusions to then apply the FMCSA's recommended five-year restriction. *Bay v. Cassens Transp. Co.,* 212 F.3d 969, 975 n.4 (7th Cir. 2000) ("Medical judgments are

subjective and may vary from doctor to doctor, and a company is entitled to rely on the determinations made by its medical professionals as long as that reliance is reasonable and in good faith.") (citations omitted).

Dr. Trangle's opinion that Witchet had a TIA does not factor into the direct threat equation. "Indeed, in many cases, the question whether one doctor is right that an employee can safely perform his job functions, or another doctor is right that the employee cannot, will be unknowable—unless the employer runs the very risk that the law seeks to prevent." *Michael*, 808 F.3d at 309. In *Michael*, the court found that the employer established its direct threat defense because "right or wrong," the medical opinions that it relied on were objectively reasonable. *Id.* The same analysis applies here. Drs. Wilson, Holland, and Charbonneau each concluded that Witchet had a stroke in the cortical area of the brain. These physicians' unanimous conclusion was objectively reasonable based on their respective review of the medical evidence, and Union Pacific may rely on it. Union Pacific was therefore permitted to issue the FMCSA's recommended restrictions because it reasonably determined Witchet was a direct threat.

### D. Union Pacific Is Entitled to Summary Judgment on Witchet's Failure to Accommodate Claim

The ADA does not require an employer to provide a reasonable accommodation to an individual who meets the definition of "disability" only under the "regarded as" prong. 42 U.S.C. § 12201(h); 29 C.F.R. § 1630.2(o)(4). "Under long-held circuit precedent, 'regarded as' plaintiffs are not entitled to reasonable accommodations because the ADA was not intended to grant reasonable accommodations to those who are not actually disabled." *Duello v. Buchanan Cty. Bd. of Sup'rs*, 628 F.3d 968, 972

(8th Cir. 2010); *Hanson*, 2018 WL 1440333 at *8 ("Employers are not required to provide accommodations when the employee is merely regarded as disabled."). Witchet admits that he has no physical condition that is a disability and is not limited in any major life activities. (Ex. 1A, Witchet Dep. 53:23-54:19). Witchet instead relies exclusively on the "regarded as" prong. (Ex. 1A, Witchet Dep. 54:4-8; 57:6-9: 200:8-11). Since his only avenue to assert an ADA cause of action is the "regarded as" prong, the failure to accommodate claim fails ([Filing No. 1](), Count II).

### E. Union Pacific Is Entitled to Summary Judgment on Witchet's ADA Disparate Impact Claim

Witchet alleges that Union Pacific violated the ADA by imposing medical selection criteria that "screens out" or has a "disparate impact" on "individuals who disclose disabilities." ([Filing No. 1](), Count III).[9] A disparate impact plaintiff must: (1) identify a specific employment practice; and (2) present statistical evidence showing that the practice caused the plaintiff to suffer an adverse action because of membership in a protected group. *Evers v. Alliant Techsystems, Inc.*, 241 F.3d 948, 953 (8th Cir. 2001).[10] The burden then shifts to the employer to produce evidence showing a legitimate business reason for the challenged practice. *Id.*

It is "not enough to simply allege that there is a disparate impact on workers, or point to a generalized policy that leads to such an impact." *Smith v. City of Jackson,*

---

[9] Although not clearly labeled in the Complaint, this is an ADA disparate impact claim. *Coons v. BNSF Ry. Co.,* 268 F. Supp. 3d 983, 987 (D. Minn. 2017) ("A disparate-impact theory of ADA liability under 42 U.S.C. § 12112(b)(6) generally refers to the use of facially neutral selection criteria that screen out or tend to screen out individuals who are disabled within the meaning of the ADA.") (citing *Raytheon Co. v. Hernandez*, 540 U.S. 44 (2003)).

[10] While *Evers* was not an ADA case, courts in the Eighth Circuit recognize that ADA plaintiffs must still adduce statistical evidence to support a disparate impact claim. *Coons,* 268 F. Supp. 3d at 987 (considering whether a railroad's practice of requiring applicants who disclose certain medical conditions to undergo medical testing at the applicant's expense has a disparate impact on individuals with disabilities under the ADA).

*Miss.,* 544 U.S. 228, 241 (2005). Rather, the employee is "responsible for isolating and identifying the specific employment practices that are allegedly responsible for any observed statistical disparities." *Id.* (citations and quotations omitted). Witchet's claim never leaves the starting gate because he identifies no specific employment practice. *Bennett v. Nucor Corp.,* 656 F.3d 802, 817 (8th Cir. 2011); *Paul v. Metro. Council*, No. CIV. 10-4759 JRT/FLN, 2012 WL 3734147, at *4, n.6 (D. Minn. Aug. 28, 2012). Witchet cannot identify the precise selection criteria that he alleges disproportionately affects individuals who disclose disabilities:

> **INTERROGATORY NO. 10:** Identify the precise selection criteria, qualification standards, employment tests and/or medical screening, that Union Pacific uses or relies upon and which have a disparate impact on individuals who disclose disabilities, as alleged in Count III of the Complaint.
>
> **ANSWER:** Defendant's fitness-for-duty and reportable health events policies disproportionately affect individuals with disabilities.

(Ex. 1J, Plaintiff's Answers to Interrogatories). Witchet cannot explain how any particular aspect of Union Pacific's "fitness-for-duty and reportable health events policies" use selection criteria that screen out "disabled" individuals. (Ex. 1A, Witchet Dep. 202:18-204:16; 205:4-16). Union Pacific is therefore left guessing what, exactly, Witchet alleges is discriminatory.

Witchet's disparate impact claim also fails because he admits that he has no statistical evidence to support whatever it is he alleges is discriminatory. (Ex. 1A, Witchet Dep. 204:17-21; 205:17-21). *Pierce v. Marsh*, 859 F.2d 601, 604 (8th Cir. 1988) (affirming summary judgment because plaintiff did not submit statistical evidence of disparate effect); *Roberts v. City of Chicago*, 817 F.3d 561, 566 (7th Cir. 2016) (affirming dismissal of ADA claim that failed to allege a "relevant and statistically

significant disparity between disabled and non-disabled applicants.").

Finally, even if Witchet could establish a *prima facie* case, legitimate safety concerns justify Union Pacific's application of FMCSA guidelines to commercial truck drivers:

> We have little difficulty concluding that Defendant may rely on a reasonable interpretation of DOT's Medical Advisory Criteria, which undoubtedly are job-related and consistent with Defendant's safety and liability concerns, to establish physical requirements for its CMV operators, provided Defendant does so consistently and uniformly.

*Tate*, 268 F.3d at 995. Witchet's disparate impact claim fails as a matter of law.

### F.    Union Pacific Is Entitled to Summary Judgment on Witchet's ADA Unlawful Medical Examination Claim

Witchet alleges in his final cause of action that Union Pacific violated the ADA by making unlawful medical inquiries. (Filing No. 1, Count IV). The ADA prohibits employers from making "inquiries of an employee as to whether such employee is an individual with a disability or as to the nature or severity of the disability, unless such examination or inquiry is shown to be job-related and consistent with business necessity." 42 U.S.C. § 12112(d)(4(A). Employers may inquire into the employee's ability to perform job-related functions. 29 § C.F.R. 1630.14(c). To show compliance with § 12112(d)(4)(A), "the employer bears the burden to show the asserted 'business necessity' is vital to the business and the ... inquiry is no broader or more intrusive than necessary." *Thomas v. Corwin*, 483 F.3d 516, 527 (8th Cir. 2007). Witchet claims that Union Pacific violated the ADA by requesting medical records "after [his] doctors had cleared him to return to work with no restrictions." (Ex. 1J, ¶ 11).[11]

---

[11] Witchet's discovery response differs from his Complaint, where he alleges that Union Pacific committed an unlawful medical examination by inquiring into "medical conditions unrelated to the hospital visit that

Witchet cannot show any unlawful inquiries after obtaining clearance from his physicians. First, Witchet admits that Union Pacific made no requests for records related to his spinal issue after his doctor cleared him on December 28, 2015 for that condition. (Ex. 1A, Witchet Dep. 207:7-17).

Second, while Dr. Rehman cleared Witchet for his neurological condition on February 12, 2016, there is no evidence that Union Pacific made any *new* requests after that date. Union Pacific sought Witchet's neurological records (including MRI scans) in October 2015 as part of the fitness-for-duty process, and Witchet did not consider those requests inappropriate. (Ex. 1A, Witchet Dep. 81:6-12; Ex. 1D at UP_Witchet_000071-72). Union Pacific later made a specific request in July 2016 for "[d]igital copies of all imaging tests (CT scans, MRI scans, Doppler tests, EEGS) and any other diagnostic tests with digital records." (Witchet Dep. Ex. 26, at UP_Witchet_000062, authenticated at Ex. 1A, Witchet Dep. 182:11-15 and attached as Ex. 1K). Union Pacific explained that it had not obtained these test images and needed them on a CD to send to Dr. Rehman for review. (Ex. 1A, Witchet Dep. 181:23-182:5; 183:2-6). Witchet admits that he did not find *this* request inappropriate, either. (Ex. 1A, Witchet Dep. 182:16-183:1). It is thus unclear what, exactly, Witchet alleges is unlawful.

In addition to Witchet's admission that the requests were appropriate, they were also justified by a legitimate business necessity. "Business necessity' under section 12112(d)(4)(A) of the ADA includes public and workplace safety." *Parker*, 158 F.Supp.3d at 822. "Screening employees for medical conditions that may interfere with ability to drive mobile equipment safely is reasonably effective method of achieving

he reported to Union Pacific." (Filing No. 1, ¶ 44). If that is the basis for his claim, it fails because there is no evidence that Union Pacific imposed the five-year restrictions on Witchet because of his cardiac or spinal condition.

employer's goal of workplace safety; Common sense suggests that [the employer] should not have to wait for an accident to occur to justify screening employees." *Id.* (citation omitted). Obvious safety concerns justify an employer's receipt of a commercial driver's neurological records following an acute incident, especially when the FMCSA advocates restrictions based on the specific neurological event.

Finally, Union Pacific sought the MRI image because neither Dr. Wilson nor Dr. Rehman had previously seen it. (Ex. 3A at UP_Witchet_000308-09; Ex. 1L, Dr. Rehman Dep. 28:4-7, 61:9-19; Ex. 2C, UP_Witchet_000108; Ex. 1A, Witchet Dep. 141:18-22; 182:3-7). Union Pacific's request for the MRI image was a permissible inquiry to determine whether Witchet sustained a stroke and its location, which is crucial under the FMCSA guidance. It was thus directly necessary to determine whether Witchet could safely perform his job. 29 § C.F.R. 1630.14(c). Witchet's unlawful medical inquiry claim fails.

## IV.  CONCLUSION

Marcus Witchet drove large commercial trucks carrying fellow employees on public roads. Union Pacific is responsible for the safety of Witchet, his co-workers, and the public that shares those same roads. When Union Pacific reasonably determined that Witchet suffered a parietal stroke in the cortical area of his brain, it applied the FMCSA's clear recommendation that drivers who have a stroke in the cortical area of the brain should not drive commercial vehicles for five years. This decision was rooted in safety and based on review of Witchet's neurological records, emergency room diagnosis, and two reports from Dr. Wilson, a third-party, board-certified neurologist. The ADA does not force employers of commercial truck drivers to ignore the medical

evidence and openly disregard the FMCSA's instruction. Witchet has no viable claim under the ADA, and his Complaint should be dismissed with prejudice.

Dated this 15th day of May, 2019

<div style="margin-left: 40%;">

UNION PACIFIC RAILROAD CO.,
Defendant,

By:   s/David P. Kennison
      Scott Parrish Moore (NE# 20752)
      David P. Kennison (NE#25510)
of   BAIRD HOLM LLP
      1700 Farnam Street
      Suite 1500
      Omaha, NE  68102-2068
      Phone: 402-344-0500
      spmoore@bairdholm.com
      dkennison@bairdholm.com

</div>

## CERTIFICATE OF SERVICE

I hereby certify that on May 15, 2019, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrant(s):

| | |
|---|---|
| David E. Schlesinger | Lindsey Krause |
| schlesinger@nka.com | lkrause@nka.com |
| | |
| Corey L. Stull | |
| cstull@atwoodlawyers.com | |

<div style="margin-left: 40%;">

s/David P. Kennison
Attorney for Defendant

</div>

DOCS/2167405.4