| | |
|---|---|
| Marcus Witchet, | Case No. 8:18-cv-00187-JFB-SMB |
| Plaintiff, | |
| v. | **PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |
| Union Pacific Railroad Co., | |
| Defendant. | **Oral Argument Requested** |

## INTRODUCTION

This case is a battle of expert opinions about whether Plaintiff Marcus Witchet was qualified to remain in his Truck Operator position with Defendant Union Pacific Railroad Company ("Union Pacific") after experiencing neurological symptoms in October 2015. Instead of conducting a proper individualized inquiry as to whether Witchet could perform the essential functions of his job, Union Pacific argues semantics, relying solely upon the label given to Witchet's condition to make its determination about his fitness for duty. Witchet has presented material facts showing he was able to perform the essential functions of the Truck Operator job, and Defendant has not shown that Witchet posed a risk sufficient to establish a direct threat defense as a matter of law. Furthermore, Defendant is unable to show that the application of its discriminatory one-percent standard is job-related and consistent with business necessity or that Witchet should have been disqualified under it. Therefore, summary judgment should be denied.

## RESPONSE TO UNION PACIFIC'S STATEMENT OF FACTS

Witchet submits this statement of facts in accordance with NECivR 56.1(b)(1). Witchet will first respond to Union Pacific's statement of facts. The numbered paragraphs

in this section correspond to the numbered paragraphs in the statement of undisputed material facts contained in Defendant's Brief in Support of Motion for Summary Judgment ("Def.'s Mem."). (Dkt. 58.) Witchet then provides a statement of additional facts, which are either disputed, or which otherwise demonstrate that Union Pacific is not entitled to judgment as a matter of law.

1. **Denied in part.** It is **admitted** that Witchet began working for Union Pacific in September 2011. However, Union Pacific did not immediately classify Witchet as a "Truck Operator 2TN+." (Plf. Ex. 1A, Plaintiff's Union Pacific Work History.)[1] Witchet began his employment with Union Pacific as a Trackman and was classified as "Truck Operator 2TN+" beginning in February 2012. (*Id.*)

2. **Admitted.**

3. **Denied in part.** It is **admitted** that the job descriptions for a Truck Operator position include the language identified in this paragraph; however, it is **denied** that these items are explicitly identified on the written job descriptions as "essential functions" of the position. (Defendant's Exhibit ("Def. Ex.") 1B at UP_Witchet_000452-56.)

4. **Admitted.**

5. **Denied in part.** It is **admitted** that a Truck Operator must obtain and maintain a Commercial Driver's License ("CDL"). It is also **admitted** that a Truck Operator must also meet the physical and medical qualifications established by the FMCSA; however, to the extent Defendant implies through this statement

---

[1] All exhibits labeled "Plf. Ex." are attached to the Declaration of Lindsey E. Krause.

that the guidelines articulated in the FMCSA Medical Examiner's Handbook are binding law, it is **denied**. (*See* Def. Ex. 2B at p. 51.)

6. **Admitted.**

7. **Denied in part.** It is **admitted** that Witchet's symptoms caused an emergency room doctor to be "concerned for a stroke," however, this fact is not admitted to the extent it implies that Witchet was diagnosed with a stroke at that precise time. (Def. Ex. 1C at UP_Witchet_000358.) It is further **admitted** that Witchet underwent a neurological workup, including CT and MRI brain imaging studies, while he was in the emergency room. Finally, it is **admitted** that Dr. Atta Rehman eventually determined that, based on the MRI conducted while Witchet was in the emergency room, Witchet had suffered a cerebrovascular accident ("CVA"); however, to the extent Union Pacific is implying that its treatment of Witchet was reasonable based on Rehman's diagnosis or that Rehman agrees with Union Pacific's assessment of Witchet's abilities or risk for future sudden incapacitation, that is **denied**. (*See* Plf. Ex. 1B, Rehman Dep., at 103:9-13 (indicating that it is "very unlikely that [Witchet] will have a seizure from this tiny stroke"): *id.* at 50:17-18 ("[Witchet] appears to be neurologically stable enough to go to work in my professional opinion.").)

8. **Denied in part.** It is **admitted** that the record referenced stated that Witchet's primary diagnosis was an "Acute CVA (Cerebrovascular Accident)." However, it is **denied** that the term "acute cerebrovascular accident" is always synonymous with "stroke." (*See, e.g.*, Plf. Ex. 1C, Trangle Dep., at 57:6-11.)

9. **Denied in part.** It is **admitted** that Union Pacific advised Witchet that it would

3

begin a fitness-for-duty ("FFD") evaluation. However, as Defendant articulates in its brief, there is a factual question as to whether Witchet informed Union Pacific he had suffered a "mild stroke" or whether he informed Union Pacific that he was told he may have had a mild stroke, but that his diagnosis was unclear. (Def. Ex. 3A at UP_Witchet_000333; Def. Ex. 1A at 68:12-16.) Therefore, Witchet **denies** that he told Union Pacific that he had definitively had a "mild stroke."

10. **Denied in part.** It is **admitted** that Union Pacific conducts FFD evaluations. However, factual questions remain as to whether the FFD process focuses on an employee's specific health condition and job duties or whether the FFD process is based on uniform rules and a generalized understanding of job duties. (*See, e.g.,* Plf. Ex. 1D, Charbonneau Dep., at 120:2-21 (explaining that Union Pacific does not differentiate based on the severity of a stroke); Holland Dep., Plf. Ex. 1E, at 32:8-15 (indicating he, in general, knows of Witchet's job duties).) It is further **admitted** that Union Pacific works with the employee to gather medical records and sometimes arranges for a third-party medical provider to evaluate the employee's records and condition. However, it is **denied** that these third-party medical providers provide a truly independent opinion. (*See* Plf. Ex. 1F, Wilson Dep., at 118:10-16 (admitting that Dr. Holland "might have influenced [or] tried to influence" Dr. Wilson, and that Dr. Wilson based his opinion on "all the information, including [Dr. Holland's] attempted influence[.]"; *see also id.* at 100:5-8 (admitting that it was possible he made corrections to his report after speaking with Dr. Holland).)

11. **Denied in part.** It is **admitted** that Union Pacific removed Witchet from service pending the results of his FFD evaluation, and that Union Pacific requested several categories of medical information. It is further **admitted** that Witchet began providing the records as requested. However, to the extent that Union Pacific characterizes Witchet's belief that these requests were appropriate as an admission that such requests were legal, such statement is **denied**.

12. **Denied in part.** It is **admitted** that Witchet visited his primary care physician, Dr. Syed Zaidi, several days after he was released from the hospital. It is further **admitted** that Defendant accurately quoted the records referenced in Paragraph 12. However, to the extent it is implied that Dr. Zaidi diagnosed Witchet with a stroke, such statement is **denied**. (*See* Def. Ex. 1E.)

13. **Admitted**.

14. **Admitted.**

15. **Denied in part.** It is **admitted** that Dr. Charbonneau advised, noted, and concluded the points articulated in this paragraph. However, to the extent this statement implies that Witchet's neurologist diagnosed him with a CVA at that time, such statement is **denied**. (Plf. Ex. 1B, Rehman Dep., at 61:9-63:7; Def. Ex. 1G at Witchet0000117-119; *cf.* Def. Ex. 3A at UP_Witchet_000331.)

16. **Admitted.**

17. **Admitted.**

18. **Admitted.**

19. **Admitted.**

20. **Admitted.**

21. **Denied in part.** It is **admitted** that, in early January 2016, Witchet authorized Dr. Charbonneau to speak with Dr. Rehman because the two doctors differed on Witchet's diagnosis. However, Plaintiff **denies** this statement to the extent it implies that Dr. Rehman and Dr. Charbonneau eventually agreed on Witchet's medical restrictions or on Witchet's ability to perform the essential functions of the Truck Operator position.

22. **Admitted.**

23. **Admitted.**

24. **Denied in part.** It is **admitted** that Witchet did not object to Union Pacific retaining Dr. Wilson; however, to the extent Union Pacific implies that Witchet's belief constitutes a legal conclusion, such statement is **denied**.

25. **Admitted.**

26. **Admitted.**

27. **Admitted.**

28. **Admitted.**

29. **Admitted.**

30. **Admitted.**

31. **Admitted.**

32. **Admitted.**

33. **Admitted.**

34. **Admitted.**

35. **Denied in part.** It is **admitted** that Union Pacific summarized the FMCSA Medical Examiner Handbook's position accurately in this paragraph. However,

as Dr. Rehman testified, while Witchet's neurological event happened in an area that comes with some risk for future seizures, Witchet's risk was "maybe slightly [sic], maybe minimum" and that "it's unlikely. It's – number one, it's very tiny. It's in the white matter. It's quite unlikely." (Plf. Ex. 1B, Rehman Dep., at 71:3-19; 72:21-73:8.)

36. **Denied in part.** It is **admitted** that the FMCSA Handbook recommends the waiting periods indicated in this paragraph. However, it is **denied** that the FMCSA thus requires these waiting periods. The relevant regulations for the FMCSA do not speak directly to how/when to certify an individual who has experienced a transient ischemic attack ("TIA") or a stroke. *See* 49 C.F.R. 391.41(b). Furthermore, the FMCSA Stroke and Commercial Motor Vehicle Driver Safety Expert Panel Recommendations indicate a one-year waiting period for individuals who have suffered a single stroke. (Plf. Ex. 1U, Exhibit B2 to Holland Rebuttal Expert Report at p. 12.)

37. **Denied in part.** It is **admitted** that Union Pacific issued the restrictions articulated in this paragraph, that these restrictions were to be in place for five years, and that Union Pacific informed Witchet that it would reassess the restrictions in five years. However, one restriction, prohibiting Witchet from working on 1-man or 2-man gangs, was initially omitted by Dr. Holland. (*See* Def. Ex. 3A at UP_Witchet_000318.) This restriction was then included only after Rhonda Ross noticed its absence from Witchet's list of restrictions, and indicated to Dr. Holland that "[t]ypically restrictions for sudden incapacitation include not working on 1-man or 2-man gangs." (*Id.*) The restriction was

thereafter issued to Witchet. (*Id.*)

38. **Admitted.**

39. **Denied in part.** It is **admitted** that Dr. Charbonneau issued restrictions for five years and based his decision on the FMCSA Medical Examiner Handbook. Furthermore, Witchet does not contest that Dr. Charbonneau stated that Dr. Wilson's recommendation of one year of restrictions to be an "inadvertent typo." However, Witchet **denies** that the record shows that Dr. Wilson made an inadvertent error. (*See* Plf. Ex. 1F, Wilson Dep., at 73:2-14 ("That *could* be a typographical error. It could be that the – that I didn't make that correction until after this had been sent out. I'm not sure. I don't recall.") (emphasis added); *cf.* Plf. Ex. 1F, Wilson Dep., at 46:10-22 (noting a disagreement between one-year and five-year waiting periods in the relevant guidance documents).)

40. **Admitted.**

41. **Admitted.**

42. **Admitted.**

43. **Admitted.**

44. **Denied in part.** It is **admitted** that Witchet visited Dr. Rehman in August 2016, and that Dr. Rehman reviewed Witchet's October 16 MRI image for the first time. It is further **admitted** that Dr. Rehman diagnosed Witchet with a stroke; however, Dr. Rehman testified that Witchet's stroke was "tiny. It's punctate." (Plf. Ex. 1B, Rehman Dep., at 66:2-7.) Furthermore, Dr. Rehman testified that his diagnosis of CVA did not have an impact on his medical opinion that Witchet was neurologically stable to return to work as of February 2016. (*Id.* at

69:5-70:8.) To the extent Union Pacific attempts to discredit Dr. Rehman's testimony, that is inappropriate for the summary judgment stage.

45. **Admitted.**

46. **Admitted.**

47. **Admitted.**

48. **Admitted.**

49. **Denied in part.** It is **admitted** that Union Pacific informed Witchet that his restrictions were for five years, and that he could be reevaluated after five years. However, Union Pacific effectively terminated Witchet's employment in the interim, as it issued him restrictions that prevented him from performing a wide range of positions within Union Pacific. (*See, e.g.,* Plf. Ex. 1E, Holland Dep., at 36 (explaining that Union Pacific considers all aspects of a job taking place in a "field setting" to be safety critical).) Furthermore, Union Pacific provided Witchet no indication of the likelihood that he would be able to return to his position after being reevaluated. (Witchet Decl. at ¶11; *see also* Plf. Ex. 1G, Employee Personal Data) (indicating that Witchet's expected return date is "12/31/9999.")

### PLAINTIFF'S SUPPLEMENTAL STATEMENT OF FACTS

1. As of October 2015, Witchet had worked at Union Pacific for four years, starting as a Trackman and then moving to a Truck Operator position in February 2012. (Plf. Ex. 1A, Work History). Witchet has held a Texas Class A interstate commercial driver's license ("CDL") since 2000. (Witchet Decl. at ¶5; Plf. Ex 1H, Witchet Dep., at 13:22-14:3.)

2. As part of the requirements for his CDL, Witchet has undergone several medical examinations by certified medical examiners, including after October 2015, each time being medically cleared to retain his CDL. (Witchet Decl. at ¶6.)[2] Witchet was most recently re-certified in 2018. (*Id.* at ¶7.)

3. Witchet has not had any residual side effects, seizures, strokes, or other neurological issues since October 2015. (*Id.* at ¶12.)

**Witchet is Hospitalized for Neurological Symptoms**

4. On October 16, 2015, Witchet began feeling numbness in his left arm, which lasted for two hours. (Plf. Ex. 1H, Witchet Dep., at 70:10-17.) At the time, Witchet did not experience numbness anywhere else in his body, nor did he experience any dizziness or lose consciousness. (Plf. Ex. 1H, Witchet Dep., at 70:14-19; 71:7-8.) As a precaution, Witchet admitted himself to Mother Frances Hospital in Tyler, Texas. (Def. Ex. 1A at 66:18-23; Def. Ex. 1C at UP_Witchet_000345 (indicating Witchet's admission was a "Self Referral.")

5. That same day, Witchet informed his supervisor, J.R. Batey, that he had been hospitalized. (Plf. Ex. 1H, Witchet Dep., at 69:8-12.)

6. When Witchet was admitted to the hospital, the records indicate that a "Code Stroke" was called. (Def. Ex. 1C at UP_Witchet_000350 (also noting a "transit alteration of awareness, less than 24 hours"); Def. Ex. 1C at UP_Witchet_000365.) As this code was given prior to diagnostic testing, it did not indicate a final diagnosis, and most likely signaled that the hospital was

---

[2] As Defendant admits, Texas has adopted the relevant FMCSA regulations. 37 Tex. Admin. Code § 4.11(a). (*See* Def's Statement of Facts at ¶27 n. 4.)

"assessing [Witchet] for the potential of a stroke," which is commonly done for any patient with neurological symptoms. (Plf. Ex. 1C, Trangle Dep., at 33:6-24; *see, e.g.,* Plf. Ex. 1B, Rehman Dep., at 93-94; *see also, e.g.,* Def. Ex. 1C at UP_Witchet_000351 (noting the reason for performing an echocardiogram study was "tia" and notes "CLINICAL HISTORY: TIA.")

7. Initially, Witchet was given a "2" on the National Institutes of Health Stroke Scale ("NIHSS"), which was later reduced to a "1." Because of his low stroke score, Witchet was not treated with a tissue plasminogen activator ("t-PA"). (Def. Ex. 1C at UP_Witchet_000354, 363.) The NIHSS ranges from 1 to 30. (Plf. Ex. 1B, Rehman Dep., at 80:3-9.)

8. Witchet underwent a CT scan and an MRI scan while at Mother Frances Hospital. (Def. Ex. 1A at 72:17-21; Def. Ex. 1C at UP_Witchet_000369.)

9. The MRI performed at the hospital indicated the presence of "a small/punctate focus of restricted diffusion identified within the right parietal matter/posterior centrum semiovale region." (Def. Ex. 1C at UP_Witchet_000350.) The MRI was otherwise "[n]egative for hemorrhage or other significant finding." (*Id.*)

10. According to Witchet, he was told by his hospital treatment team that the tests performed at the hospital did not show a concrete diagnosis. (Plf. Ex. 1H, Witchet Dep., at 78:11-79:6; Witchet Decl. at ¶9.) At the time, the doctors suggested to Witchet that he may have had a transient ischemic attack ("TIA") or that he could have multiple sclerosis ("M.S."). (Plf. Ex. 1H, Witchet Dep. at 83:18-25; Witchet Decl. at ¶9.) While at the hospital, Witchet was never verbally informed that he had suffered a CVA or stroke. (*Id.* at ¶9.)

11. Witchet's hospital records indicate that there "was no evidence of residual deficit on the day of discharge." (Def. Ex. 1C at UP_Witchet_000346.)

12. After being released from the hospital, Witchet's primary care doctor, Dr. Syed Zaidi, referred Witchet to a neurologist, Dr. Atta Rehman. (Plf. Ex. 1I, 10/20/15 Rehman Records). Witchet first saw Dr. Rehman on October 20, 2015. (*Id.*)

13. Based on his examination of Witchet, Dr. Rehman ordered an MRI of Witchet's brain and an MRI of Witchet's cervical spine, with and without contrast. (*Id.*) Dr. Rehman and Witchet reviewed these MRIs together on November 9, 2015. (Plf. Ex. 1J, 11/9/15 Rehman Progress Notes.)

14. Dr. Rehman noted that, as of November 9, Witchet "did not have any more episode [sic] of numbness in his left arm." (*Id.*)

15. On the radiologist's report related to Witchet's brain MRI, it stated "No acute hemorrhage, acute ischemia, or mass." (Plf. Ex. 1K, 11/9/15 Rehman Report.) Dr. Rehman interpreted this to mean "no bleeding on the brain, no stroke due to ischemia, lack of blood supply, or clot in the brain, or no tumor or mass in the brain." (Plf. Ex. 1B, Rehman Dep., at 43:21-25.) The radiologist further noted that the MRI indicated a "[D]isorder of brain, unspecified." (Plf. Ex. 1K, 11/9/15 Rehman Report.)

16. Dr. Charbonneau agreed that it was possible that doctors could have differing options as to Witchet's "constellation of symptoms" might mean. (Plf. Ex. 1D, Charbonneau Dep., at 75:9-16.)

17. Dr. Kevin Trangle, Plaintiff's expert, opined that Witchet's "constellation of symptoms and findings could be considered **at most** consistent with a **TIA**."

(Def. Ex. 1I at 11 (emphasis in original).) He also stated that "[t]here was no fixed structural brain abnormality, and no clinical persistent neurological findings which would be expected with a stroke." (*Id.* at 12.) Based on Dr. Trangle's review, it is his opinion "within a reasonable degree of medical certainty that [Witchet] had a TIA and not a stroke." (Plf. Ex. 1L, Trangle Rebuttal Expert Report at 6.)

18. Dr. Trangle reasoned that the MRI conducted at the hospital was likely "done precisely at the point of the TIA with demonstrated decreased profusion, which is a transient phenomenon characteristic of a TIA." (Def. Ex. 1I at 12.)

19. Furthermore, Dr. Trangle indicated that Witchet's "overall clinical presentation including his imaging findings are totally consistent with other cases described in the medical literature who have been characterized as having a TIA as opposed to actual strokes." (Plf. Ex. 1L, Trangle Rebuttal Expert Report at 6; *see generally id.*(collecting literature).)

**Witchet Undergoes a Fitness-For-Duty Evaluation**

20. Witchet informed Union Pacific's Health and Medical Services ("HMS") Department of his medical situation on October 19, 2015, and was informed by nurse Rhonda Ross that Union Pacific would conduct a fitness-for-duty ("FFD") review. (Def. Ex. 3A at UP_Witchet_000333.) Witchet was placed on a temporary medical leave of absence pending the outcome of the FFD review. (Def. Ex. 1D at UP_Witchet_000071.)

21. Witchet's FFD review was initially handled by Dr. John Charbonneau, an Associate Medical Director ("AMD") at Union Pacific. (Def. Ex. 3A at

UP_Witchet_000331-332.) Sometime thereafter, Dr. Charbonneau enlisted the assistance of Union Pacific's Chief Medical Officer, Dr. John Holland, to review Witchet's case. (*See* Def. Ex. 3A at UP_Witchet_000325.)

22. As part of its FFD review, Union Pacific initially requested that Witchet provide Union Pacific with a variety of medical records. (Def. Ex. 1D at UP_Witchet_000071-72 (listing types of documents requested).)

23. On November 10, 2015, Dr. Zaidi authored a Medical Progress Report related to Witchet which states that Witchet was expected to be "able to return with no restrictions" on November 30, 2015. (Plf. Ex. 1M, 11/10/15 Medical Progress Report.) Dr. Zaidi cleared Witchet to work and provided a full duty release form to Union Pacific in early December 2015. (Plf. Ex. 1N, 12/1/15 Medical Progress Report.)

24. On December 9, 2015, Dr. Rehman's office faxed a copy of Witchet's November radiology records to Rhonda Ross. (Def. Ex. 3B.) A note reading "This [sic] are MRI reports indicating no stroke!" was written on the fax cover page. (*Id.*)

25. In late December 2015, Dr. Charbonneau noted that he believed Union Pacific would "need a neurology file review," and asked Ross to seek approval from the Director of Clinical Services for Union Pacific, Deborah Gengler. (Def. Ex. 3A at UP_Witchet_000328.) At first, Gengler encouraged Dr. Charbonneau to speak with Dr. Rehman in lieu of a medical file review. (*Id.* at UP_Witchet_000327.)

26. On January 7, 2016, Dr. Charbonneau and Dr. Rehman spoke on the phone

about Witchet's condition. Dr. Rehman indicated to Dr. Charbonneau that his final diagnosis was a TIA as opposed to a stroke, and told Dr. Charbonneau that he would forward Union Pacific notes from his appointments with Witchet. (*Id.* at UP_Witchet_000326.)

27. In late January 2016, Union Pacific retained Dr. Reed Wilson to review Witchet's medical file. (Def. Ex. 3A at UP_Witchet_000325.)

28. In conducting his review, Dr. Wilson never met, spoke with, or tried to speak with Witchet, nor did Dr. Wilson speak with or try to speak with any of Witchet's treating physicians. (Plf. Ex. 1F, Wilson Dep., at 14:9-21.) Additionally, Dr. Wilson did not review any scientific literature while working on Witchet's file. (*Id.* at 14:22-15:1.) In fact, Dr. Wilson only spent one hour on Witchet's matter in February 2016. (*Id.* at 18:9-17.)

29. In Dr. Wilson's first report, authored in February 2016, he prescribed one year of restrictions for Witchet. (Def. Ex. 2A.) Specifically, Dr. Wilson noted that, "For persons with health conditions similar to this employee, the FMCSA guidance documents pose a one-year duration of moderate risk for sudden incapacitation." (Plf. Ex. 1F, Wilson Dep., at 50:12-22; Def's Ex. 2A at UP_Witchet_000294.) At the time Dr. Wilson indicated that Witchet's condition warranted one year of restrictions, he was aware of Witchet's physical symptoms. (Plf. Ex. 1F, Wilson Dep., at 47:5-11.)

30. After receiving Dr. Wilson's initial report, and after speaking with Dr. Holland and Gengler, Dr. Charbonneau indicated that Witchet would "require a 5 year period of sudden incapacitation restrictions." (Def. Ex. 3A at

UP_Witchet_000323.)

31. Specifically, Dr. Charbonneau indicated that Witchet was: "(1) Not to operate company vehicles, on-track or mobile equipment, or fork-lifts. (2) Not to work on rail trains or work trains dumping ballast. . . . (3) Not to operate cranes, hoists or machinery . . . . (4) Not to work at unprotected heights over 4 feet above the ground. . . . [and] (5) Not to work on 1-man or 2-man gangs[.]" (*Id.* at UP_Witchet_000324.) Dr. Charbonneau communicated these restrictions to Witchet via phone the following day. (*Id.* at UP_Witchet_000323.)

32. On February 12, 2016, Dr. Rehman wrote a letter to Union Pacific on Witchet's behalf indicating that Witchet was "neurologically stable . . . to return to his work." (Plf. Ex. 1O, 2/12/16 Rehman Letter.)

33. Despite receiving the letter from Dr. Rehman, Dr. Charbonneau, after consulting with Dr. Holland, determined that Witchet remained unfit for duty. (Def. Ex. 3A at UP_Witchet_000322.) Union Pacific then requested that Witchet provide it with a CD with all CT and MRI image studies of his brain and cervical spine. (*Id.*)

34. At some point between February and April 2016, Dr. Holland took over for Dr. Charbonneau as the primary doctor assigned to Witchet's case. (*See, e.g.* Def. Ex. 3A at UP_Witchet_000318-321.)

35. Dr. Holland confirmed Witchet's work restrictions on April 8, 2016, and communicated the restrictions to Witchet via letter on April 14, 2016. (Def. Ex.

1H at UP_Witchet_000436; Def. Ex. 3A at UP_Witchet_000317-320.)[3]

36. To determine whether Witchet's restrictions could be accommodated, Union Pacific relied on the opinion of Mark Wheeland, Chief Engineer for the Southern Region. (Plf. Ex. 1P, Union Pacific Restriction Review Form.) Wheeland admitted that he was not aware of any employee who had been accommodated with Witchet's restrictions. (Wheeland Dep., Plf. Ex. 1Q, at 40:8-15.)

**Union Pacific Reconsiders Witchet's Case**

37. In June 2016, Union Pacific agreed to review Witchet's FFD determination. *See* Def. Ex. 3A at UP_Witchet_000313) (referencing Union Pacific's utilization of a three-doctor panel).) During the review, Union Pacific requested that Witchet provide digital copies of all imaging studies performed during his October 2015 hospital stay. (*Id.* at UP_Witchet_000307.)

38. Also, around this time, Dr. Holland conferred again with Dr. Wilson about Witchet's case by phone. (Def. Ex. 3A at UP_Witchet_000313; Plf. Ex. 1F, Wilson Dep., at 45:5-11, 55-57.)

39. In August 2016, Dr. Wilson authored an addendum to his original report. (Def. Ex. 2C.) In his addendum, Dr. Wilson indicated that he reviewed the MRI of Witchet's brain conducted on October 16, 2015, and confirmed his opinion that Witchet had a stroke. (*Id.*) Dr. Wilson later testified that he "[doesn't] think [he]

---

[3] Though, initially, Dr. Charbonneau noted he believed Witchet to have "a myriad of serious medical conditions," Dr. Holland testified that Union Pacific issued work restrictions to Witchet based only on his neurological condition. (Def. Ex. 3A at UP_Witchet_000331; Plf. Ex. 1E, Holland Dep., at 10:6-24.)

ever saw the second scan," meaning the November 9, 2015 MRI. (Plf. Ex. 1F, Wilson Dep., at 63:2-3.)

40. Around this same time, Witchet saw Dr. Rehman for a follow-up appointment. (Def. Ex. 1G.) At this appointment, Dr. Rehman viewed the MRI that was performed on Witchet during his hospitalization. (*Id.*) For the first time, Dr. Rehman indicated that Witchet's diagnosis was a "Cerebrovascular accident (CVA), unspecified mechanism;" however, Dr. Rehman noted that Witchet "appear[ed] to be neurologically stable[.]" (*Id.*)

41. On September 13, 2016, Dr. Holland concluded Union Pacific's reconsideration of Witchet's case and upheld his five-year restrictions. (Def. Ex. 3A at UP_Witchet_302-304.)

42. While Dr. Wilson's addendum report was dated August 14, 2016, it is unclear whether Union Pacific received the addendum until after it concluded its reconsideration of Witchet's case. (*See id.* at UP_Witchet_302.)

43. While Union Pacific initially placed Witchet on a medical leave of absence for 30 days, this leave was extended indefinitely, and effectively terminated Witchet's employment. (*See* Plf. Ex. 1G, Plaintiff's Employee Personal Data (indicating that, as of the date of the document, Witchet is still on medical leave and his expected return date is "12/31/9999.").)

**Union Pacific's Reliance on the FMCSA Handbook and Other Guidelines**

44. The Federal Motor Carrier Safety Administration's ("FMCSA") Medical Examiner Handbook (hereinafter the "FMCSA Handbook") "help guide[d]" Union Pacific's decision to issue Witchet restrictions. (Plf. Ex. 1E, Holland

Dep., at 21:9-13.)

45. The FMCSA Handbook "provides information and guidance to the medical examiner who performs the commercial medical examination." (Def. Ex. 2B at p. 7.) The recommendations contained within the FMCSA Handbook are not legally binding. (*Id.* at p. 51.)

46. Dr. Wilson observed a conflict in the FMCSA's supporting literature related to Witchet's condition, with one source of guidance calling for one-year restrictions and another source calling for five years of restrictions. (Plf. Ex. 1F, Wilson Dep., at 51:10-24.) Specifically, while the FMCSA Handbook articulates two separate waiting periods for strokes—one and five years, respectively—the FMCSA Stroke and Commercial Motor Vehicle Driver Safety Expert Panel Recommendations indicate a one-year waiting period for drivers who have experienced a single stroke. (Def. Ex. 2B at 160; *cf.* Plf. Ex. 1U, Holland Rebuttal Rep. Ex. B2 at 12.)

47. Dr. Wilson testified that the difference between issuing an individual with Witchet's condition one year of restrictions and five years of restrictions is "totally arbitrary," and he agreed that "you could argue it either way." (Plf. Ex. 1F, Wilson Dep., at 60:25-61:12.)

## **ARGUMENT**

Defendant moved for summary judgment on all of Witchet's claims. This motion should be denied as to Witchet's claims for Disability Discrimination and Unlawful

Screening in violation of the ADA.[4] Witchet has established valid claims or, at a minimum, established that factual questions preclude summary judgment. *First*, with respect to Witchet's disability discrimination claim, Witchet has demonstrated that he is a qualified individual with a disability for purposes of the ADA. Furthermore, Union Pacific removed him from service and refused to allow him to continue working in his position *because* it regarded him as physically impaired. *Second*, the Court should deny Union Pacific's motion as to Witchet's unlawful screening claim, as Union Pacific relies on a discriminatory qualification standard and, at a minimum, factual questions remain as to whether the one percent standard is job related and consistent with business necessity. *Finally,* Union Pacific is unable to prevail on its "direct threat" and "business necessity" affirmative defenses. As such, Union Pacific's motion should be denied.

## I.       Standard of Law

Pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate *only* if the moving party shows that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." The Court must view the record in the light most favorable to the non-moving party, and must give the non-moving party "the benefit of all reasonable inferences that may be drawn from the evidence." *Maitland v. University of* Minnesota, 155 F.3d 1013, 1015 (8th Cir. 1998). At the summary judgment stage, the Court must not "weigh the evidence, make credibility determinations, or attempt to determine the truth of the matter." *Quick v. Donaldson Co.*, 90 F.3d 1372, 1376-77 (8th Cir. 1996) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

---

[4] Witchet voluntarily dismisses his Failure to Accommodate claim (Count II) and his Impermissible Medical Examination claim (Count IV).

242, 249 (1986)). "If reasonable minds could differ as to the import of the evidence, summary judgment is inappropriate." *Id.* at 1377 (citing *Anderson*, 477 U.S. at 250) (internal quotation marks omitted).

## II.     Witchet is a Qualified Individual with a Disability for Purposes of the ADA

Each of Witchet's two remaining ADA claims require him to show that he is a qualified individual with a disability, which he can do. "Disability" under the ADA means: (1) a physical or mental impairment that substantially limits one or more life activities ("actual" disability); (2) being regarded as having such an impairment ("regarded as" disability); or (3) a record of such an impairment ("record of" disability). 42 U.S.C. § 12102(1). Witchet pursues his claims under the "regarded as" category.

### a.   Union Pacific regarded Witchet as disabled.

Under the ADA, an individual is "regarded as" disabled if he has been subjected to an adverse employment action because of an actual or perceived physical or mental impairment, whether or not that impairment limits or is perceived to limit a major life activity. 42 U.S.C. § 12102(3)(A). A "physical impairment" is defined as a "physiological disorder or condition . . . affecting one or more body systems." 29 C.F.R. § 1630.2(h)(1). The "regarded as" prong does not cover impairments that are transitory *and* minor; however, "[w]hether an impairment is both 'transitory and minor' is a question of fact that is dependent upon individual circumstances." 28 C.F.R. § Pt. 35, App. C. While Witchet's symptoms may have been transitory in nature, there is, at a minimum, a factual question as to whether Witchet's impairment was transitory *and* minor.

Union Pacific unquestionably regarded Witchet as having a physical impairment. *See, e.g., Baum v. Metro Restoration Services, Inc.*, 764 Fed. Appx. 543, 547 (6th Cir. 2019) (finding a factual dispute as to whether an employer regarded an employee as

disabled when an employer's stated reason for terminating the employee was "his health issues[.]"); *see also Littlefield v. Nevada, ex. Rel. Department of Public Safety*, 195 F. Supp. 3d 1147, 1154-55 (D. Nev. 2016) (finding that an employer regarded an applicant as disabled when it declined to hire him pursuant to internal medical requirements). The record is replete with evidence that Union Pacific was aware of and acknowledges Witchet's 2015 neurological episode, its effects, and alleged ongoing risks associated with it, and made its adverse employment decision solely based on that condition. (*See, e.g.,* Plf. Ex. 1E, Holland Dep., at 10:6-24; Plf. Ex. 1R, Holland Status Review; Plf. Ex. 1S, Letter Regarding FFD Decision.) "The fact that the Railroad placed [an employee] on sudden-incapacitation restrictions . . . shows that, at a minimum, it regarded [that employee] as having a physical impairment that substantially limited one or more major life activities." *Woodus v. Union Pacific Railroad Co.*, 2018 WL 6340765, at *3 (E.D. Ark. Mar. 3, 2018) (denying summary judgment on a Union Pacific employee's "regarded as" disability discrimination claim when Union Pacific issued the employee one-year sudden incapacitation restrictions despite clearance from the employee's doctors).

Here, Defendant places inappropriate hurdles on Witchet's ability to advance a "regarded as" claim by arguing that Union Pacific is absolved of all liability because its assessment of Witchet's condition was built on the opinions of physicians. (Def. Mem. at 17-18.) According to Union Pacific, reliance on opinions from physicians undercut "regarded as" claims because they show that the employer's conduct was not based upon myths or stereotypes about the disabled. (*Id.*) This conclusion does not comport with the ADA's current articulation of "regarded as" claims.

As this Court has recognized, the ADA, as amended ("ADAAA") "expanded the

definition of a disability, and requires it to be construed in favor of broad coverage." *Hernandez v. Hormel Foods Corp.*, 2018 WL 5265909, at *3 (D. Neb. Sept. 6, 2018) (internal citations omitted). Furthermore, the regulations authored to implement the ADAAA it explicitly note that "an employer regards an individual as disabled if it takes a prohibited action against the individual because of an actual or perceived impairment. . . *whether or not* myths, fears, or stereotypes about disability motivated the decision." Regulations To Implement the Equal Employment Provisions of the Americans With Disabilities Act, as Amended, 76 Fed. Reg. 16978-01 (hereinafter "Implementing Regulations"). The Implementing Regulations then go on to state that language about "myths, fears, and stereotypes" was purposefully deleted from the 1991 version of the regulations' appendix so as to avoid it being misconstrued as a requirement. *Id.*

The cases Defendant cites in support of its arguments on this point either predate the ADAAA, rely on pre-ADAAA case holdings, or are otherwise flawed. For example, in *Watt v. City of Crystal*, the Court relied on *Wisbey v. City of Lincoln, Neb.* to support the conclusion that restrictions based upon the recommendations of physicians preclude a "regarded as" claim. 2015 WL 7760166, at *6 (D. Minn. Dec. 2, 2015) (citing 612 F.3d 667, 673 (8th Cir. 2010)). However, the *Wisbey* holding was based on the pre-2008 version of the ADA, as the employer's conduct pre-dated the effective date of the amendments. 612 F.3d 667. Furthermore, in *Wurzel v. Whirlpool Corp.*, the Court incorrectly incorporated a "direct threat" analysis into the question of whether Whirlpool regarded the employee as disabled. 2010 WL 1495197, at *7-*8 (N.D. Ohio Apr. 14, 2010).[5] The

---

[5] The Sixth Circuit did not address this analysis on appeal. 482 Fed. Appx. 1, 10-11 (6th Cir. 2012).

applicable regulations support a determination that whether an individual was "regarded as" disabled and whether an employer properly raised a "direct threat" affirmative defense are separate issues. *See* 29 C.F.R. § 1630 App., § 1630.2(1), 74 Fed. Reg. at 48449. As the regulations explain, after "establishing disability under any of the three prongs of the definition, the individual must still establish the other elements of a claim and the employer may raise any available defenses." *Id.*

In addition, Union Pacific unpersuasively argues that three additional facts undermine Witchet's "regarded as" claim. *First*, Union Pacific claims that, because it "encouraged and helped Witchet find a job compatible with his restrictions," it did not regard him as disabled. (Def's Mem. at 18.) However, this argument is belied by Witchet's restrictions themselves and the wide class of jobs he was undoubtedly excluded from because of them. For example, Mark Wheeland, Union Pacific's Chief Engineer for the Southern Region, admitted that he had never been able to accommodate an employee with Witchet's restrictions. (Plf. Ex. 1Q, Wheeland Dep., at 38:18-39:2; *see also id.* at 12-13 (explaining the scope of Union Pacific departments he oversees as Chief Engineer).) While Union Pacific may have offered to assist Witchet in finding a job within the company, the evidence suggests that this offer was futile. *Second*, the fact that Union Pacific *may* someday allow Witchet to return to work does not counteract his "regarded as" claim. Union Pacific cites *Fischer v. Minneapolis Pub. Schools* in support of its argument, yet the court in *Fischer* draws this conclusion without any support, persuasive or otherwise. 792 F.3d 985, 989-990 (8th Cir. 2015). Articulating a mere possibility that Union Pacific will one day see Witchet as fit-for-duty does not undercut the fact that Union Pacific restricted Witchet from work in 2016 *because of* his medical condition, thus regarding him as

disabled. *See* 42 U.S.C. § 12102(3)(A). *Finally*, Union Pacific's reliance on Dr. Trangle's opinion to support its argument is inapposite. Dr. Trangle's opinion that some waiting period may have been appropriate for Witchet had no bearing on Union Pacific's view of Witchet, his condition, or his abilities at the time the decision was made. *See, e.g., Fischer*, 792 F.3d at 990 n.2 (8th Cir. 2015) ("Fischer also relies on the report of his proposed expert . . . to support his argument that MPS regarded him as disabled. But here, [the expert's] 2013 examination of Fischer has no bearing on whether MPS regarded Fischer as disabled in 2011 when it decided not to reinstate him.").

Because Witchet, at a minimum, has successfully raised factual questions as to whether Union Pacific regarded him as having a physical impairment, Union Pacific is not entitled to summary judgment on this point.

### b. Witchet was Qualified for the Truck Operator Position.

"The term 'qualified individual' means an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). Qualification is a two-step inquiry, and an individual must "satisfy[y] the requisite skill, experience, education and other job-related requirements of the employment position" and "with or without reasonable accommodation [be able to] perform the essential functions of such position." 29 C.F.R. § 1630.2(m). Witchet is easily able to satisfy the first part of the inquiry as Witchet had been employed by Union Pacific as a Truck Operator or Trackman with minimal issues since 2011.[6]

The parties' disagreement stems from the second part of the inquiry: whether

---

[6] Union Pacific does not appear to contest this point.

Witchet could have performed the essential functions of the Truck Operator position. Witchet understands and appreciates that, as a Truck Operator, safe driving is an integral part of his position. However, factual questions remain as to what that requires in this context, and whether Witchet could drive safely. Initially, there is disagreement in the record over whether Witchet's neurological condition should be classified as a transient ischemic attack ("TIA") or a cerebrovascular accident ("CVA") or stroke. However, even assuming *arguendo* that Witchet suffered a CVA, he was qualified to perform the essential functions of the Truck Operator position.

Union Pacific argues that Witchet could not perform the essential functions of the Truck Operator position, as Witchet cannot comply with non-binding guidelines articulated in the FMCSA Handbook. Yet "the ADA requires an individualized assessment as to whether [an] employee is qualified to safely perform his job, and not a blanket exclusion based on the physical requirements of 49 C.F.R. § 391.41 [the FMCSA's medical requirements]." *Nichols v. City of Mitchell*, 914 F. Supp. 2d 1052, 1060-63 (D.S.D. 2012). To the extent Union Pacific "relies on blanket exclusions set forth in 49 C.F.R. § 391.41, there was no individualized assessment of [Witchet's] ability to perform the job safely." *Id.* at 1060-1061; *accord Millage v. City of Sioux City*, 258 F. Supp. 2d 976, 992 (N.D. Iowa 2003) (citing *Kapche v. City of San Antonio*, 304 F.3d 493 (5th Cir. 2002)). As an initial matter, the relevant regulations do not create a specific exclusion—temporary or otherwise—for those who have Witchet's condition. The only requirement is that a driver be free from a condition "likely to cause loss of consciousness or any loss of ability to control a motor vehicle[.]" 49 C.F.R. 391.41(b)(7). Yet Union Pacific treated the FMCSA Handbook as law and unquestionably relied upon a blanket *suggested* waiting period to

determine that, because Witchet's neurological episode was labeled a stroke/CVA, he was not qualified to perform the essential functions of the Train Operator position for at least five years. This conclusion was contrary to the indication of Dr. Rehman—that Witchet's neurological stability allowed him to return to work—and belied by Witchet's medical records. This opinion is also weakened by Dr. Trangle's conclusion that Witchet deserved, at most, a one-year waiting period. Finally, this conclusion is also undercut by Witchet's ability to retain a Class A CDL, which requires FMCSA compliance, without interruption during the relevant time period. (Witchet Decl. at ¶5-6.) As such, fact issues preclude Union Pacific's motion for summary judgment as to whether Witchet was qualified to perform the essential functions of the Truck Operator position.

Union Pacific relies on the *Hurd v. Cardinal Logistics Mgmt. Corp.* case in support of its argument, yet that case is distinguishable. 2018 WL 4604558 (W.D. Va. Sept. 25, 2018). *Hurd* involved a driver who was epileptic and on antiseizure medication. *Id.* at *1. The Court in *Hurd*, in part, relied on numerous cases that have held that epilepsy or a history of epilepsy is an automatically disqualifying medical condition for DOT purposes. *Id.* at *5-*6. In addition, while the defendant in *Hurd* referenced the FMCSA Handbook in its argument, the Court focused primarily on the "Medical Advisory Criteria," articulated at 49 C.F.R. pt. 391, App. A. While these Medical Advisory Criteria provide detail as to how epilepsy and other nonepileptic seizures should be handled, it provides no guidance on TIAs or strokes. *Id.*

When determining whether Witchet needed restrictions—and, thus, whether he was able to perform the essential functions of his position—Union Pacific did not take into account the opinions of Witchet's treating doctor. On February 12, 2016, Dr. Rehman

wrote a letter stating that Witchet was "neurologically stable . . . to return to his work." (Plf. Ex. 1O, Rehman Letter). While Union Pacific will be quick to point out that this letter was drafted before Dr. Rehman labeled Witchet's condition as a CVA, Dr. Rehman testified that this change in diagnosis had no impact on Dr. Rehman's opinion that Witchet was neurologically stable enough to return to work as of February 2016. (Plf. Ex. 1B, Rehman Dep., at 69:5-70:20.) This case is similar in many respects to *Woodus v. Union Pacific*, 2018 WL 6340765. In *Woodus*, the district court determined that whether Woodus could perform the essential functions of his job was a disputed material fact, as Woodus's doctors determined that he could safely return to work, but Union Pacific gave him sudden incapacitation restrictions. *Id.* at *3.

In short, the parties' disagreement on this issue stems largely from the conflicting testimony of Plaintiff's and Defendant's experts, which in and of itself presents a material fact question. "It is not a district court's function on summary judgment to resolve an issue of fact based on conflicting expert testimony." *See Montgomery v. Union Pacific Railroad Co.*, 2018 WL 6110930, at *6 (D. Ariz. Nov. 21, 2018) (quoting *Scharf v. U.S. Attorney Gen.*, 597 F.2d 1240, 1243 (9th Cir. 1979)) (internal quotation marks omitted); *accord Town of Southold v. Town of E. Hampton*, 477 F.3d 38, 52 (2d Cir. 2007) (cautioning that courts "must be wary of granting summary judgment when conflicting expert reports are presented").

Here, the opinions of the parties' experts fall within a spectrum, undoubtedly creating factual questions ripe for jury consideration. Dr. Trangle, Plaintiff's expert, opined that Witchet's "complete clinical picture" indicated that Witchet had suffered a TIA, as "he did not show clinical signs or symptoms, or persistent imaging abnormalities consistent

with a CVA." (Def. Ex. 1I at 12.) Dr. Trangle stated that, while he would recommend a one-year waiting period for Witchet, he conceded that "looking at one year is really almost the worst case scenario for someone like [Witchet]. In fact, there's argument that he can be [restricted] a lot less than one year based on his findings on the MRI scan and follow-up." (Plf. Ex. 1C, Trangle Dep., at 134:1-19.) Next, while Dr. Rehman ultimately determined that Witchet presented with an "acute tiny area of stroke in the right parietal lobe," he further opined that, with that type of diagnosis "there is a very good prognosis, very good recovery and – but still it's physically normal." (Plf. Ex. 1B, Rehman Dep., at 65:9-11; 70:4-6.) Dr. Rehman also stated that Witchet's chance of having a seizure as a result of this condition—because of both its size and its location in the white matter of Witchet's brain—was "quite unlikely." (*Id.* at 73:4-8.)

By contrast, Dr. Charbonneau, Dr. Holland, and Dr. Wilson, relying on the FMCSA Handbook, all determined that Witchet required a five-year waiting period due his neurological condition. (Plf. Ex. 1F, Wilson Dep., at 73:22-25; Plf. Ex. 1D, Charbonneau Dep., at 88:14-17; Plf. Ex. 1E,Holland Dep., at 11:8-14.) However, there is little evidence in the record to suggest that Drs. Charbonneau, Holland, or Wilson independently considered Witchet's actual physical condition or then-current symptoms when making their decision, instead relying solely upon the label given to his condition. (*See, e.g.,* Plf. Ex. 1D, Charbonneau Dep., at 120:7-21 (indicating that Union Pacific does not consider different waiting periods based on the severity of stroke).)

Because Witchet has raised questions of material fact related to whether he was qualified to perform the essential functions of the Truck Operator position, summary judgment must be denied on this issue.

### III. Witchet's Disability Discrimination Claim

The ADA prohibits employers from "discriminat[ing] against a qualified individual on the basis of disability in regard to . . . discharge of employees . . . and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). Witchet can establish that Union Pacific discriminated against him based on his disability when it issued him work restrictions and prevented him from returning to his Truck Operator position for a period of five years with no guarantee he would ever be able to return.

Because Defendant admits that it took Witchet's disabling condition into account, the framework of *McDonnell Douglas* is not applicable. *See Bates v. United Parcel Service, Inc.*, 511 F.3d 974, 988 (9th Cir. 2007) (noting that the use of burden shifting is unnecessary when it is undisputed that an employer made an employment decision on a proscribed basis – in that case, disability in the form of hearing impairment); *accord Monette v. Electronic Data Systems Corp.*, 90 F.3d 1173, 1182 (6th Cir. 1996) *abrogated on other grounds by Lewis v. Humboldt Acquisition Corp., Inc.*, 681 F.3d 312 (6th Cir. 2012) ("The *McDonnell Douglas* burden shifting approach is unnecessary because the issue of the employer's intent, the issue for which *McDonnell Douglas* was designed, has been admitted by the defendant[.]"), *Montgomery v. Union Pacific Railroad Company*, 2018 WL 6110930, at *4 (D. Ariz. Nov. 21, 2018) ("There is no dispute . . . that Defendant rescinded Plaintiff's job offer based on his prior aneurysm. Therefore the burden-shifting framework is inapplicable.") (internal citation omitted). *See also Lowery v. Hazelwood School Dist.*, 244 F.3d 654, 658 (8th Cir. 2001) ("Any credible evidence tending to establish that an employer acted adversely to an individual 'on account of' his disability will suffice to provide an inference of discrimination for purposes of summary judgment."); *Hamilton v. Ortho*

*Clinical Diagnostics*, 2014 WL 2968497, *5-*6 (E.D. Ark. Jul. 2, 2014) (determining that evidence of a memorandum explaining that the specific reason for an employee's termination was his lifting restriction constituted direct evidence of disability discrimination).

Contrary to Defendant's assertion, because Union Pacific has admitted it took Witchet's medical condition into account, Witchet need not otherwise prove a *prima facie* case, nor must he show that Defendant's reason for failing to return him to his Truck Operator position was pretextual. Defendant's reason for failing to return Witchet to his position—that Witchet's medical condition allegedly poses too great a risk—does not "actually constitute a valid nondiscriminatory explanation" nor does it "disclaim[ ] any reliance on [Witchet's] disability[.]" *Dark v. Curry Cty.,* 451 F.3d 1078, 1084 (9th Cir. 2006). Therefore, Defendant's reason, "as a matter of law, fails to qualify as a legitimate, nondiscriminatory explanation[.]" *Id.* Because Union Pacific explicitly took Witchet's condition into account when issuing him restrictions that effectively rendered him unable to work, there is sufficient evidence to bypass the traditional burden-shifting framework of *McDonnell Douglas*.

However, if the Court were to reject Witchet's position and require he make a *prima facie* showing of disability discrimination, he is able to easily do so. In order to articulate a *prima facie* case, Witchet must establish the following elements: (1) he is disabled within the meaning of the ADA; (2) he is qualified, with or without reasonable accommodation, to perform the essential functions of the job he held or desired; and (3) he was discriminated against because of his disability. *Chalfant v. Titan Distribution, Inc.*, 475 F.3d 982, 988 (8th Cir. 2007). As articulated in detail in the foregoing sections, Witchet is disabled within

the meaning of the ADA, as Union Pacific regarded him as having a physical impairment. Furthermore, Witchet has, at a minimum, raised factual questions as to whether he was qualified to perform the essential functions of the Truck Operator position. Finally, Witchet is able to show the causal element of his *prima facie* case. As Dr. Holland admitted, Witchet was precluded working for a period of at least five years *because of* his neurological condition. (*See* Plf. Ex. 1E, Holland Dep., at 10:6-24; Plf. Ex. 1R, Holland Status Review.) Furthermore, Union Pacific's decision to assign Witchet five-year restrictions, despite Dr. Wilson's acknowledgement that the difference between a one-year and a five-year waiting period for someone with Witchet's condition is "totally arbitrary," suggests bias. (Plf. Ex. 1F, Wilson Dep., at 60-61.) This evidence is sufficient to raise requisite factual questions to preclude summary judgment on Witchet's disability discrimination claim.

### a. Union Pacific cannot prove its "direct threat" affirmative defense as a matter of law.

Union Pacific argues that, even if Witchet is a qualified individual, summary judgment would still be appropriate because Witchet posed a direct threat to the health and safety of himself and others. However, Union Pacific is unable to prevail on a "direct threat" affirmative defense in this case, and certainly cannot obtain affirmative summary judgment on this issue. "A 'direct threat' is defined as 'a *significant risk* to the health or safety of others that cannot be eliminated by reasonable accommodation.'" *E.E.O.C. v. Wal-Mart Stores, Inc.*, 477 F.3d 561, 571 (8th Cir. 2007) (quoting 42 U.S.C. § 12111(3)) (emphasis added). An individualized direct threat analysis is required and must rely on the "best current medical or other objective evidence in order to protect disabled individuals from discrimination based on prejudice, stereotypes, or unfounded fear." *Id.* (quoting *Nunes v. Wal-Mart Stores, Inc.*, 164 F.3d 1243, 1248 (9th Cir. 1999), citing in turn *Bragdon*

*v. Abbott*, 524 U.S. 624 (1998) and *Sch. Bd. of Nassau County, Fla. v. Arline*, 480 U.S. 273 (1987)). The employer has the burden of proof to show direct threat. *Id.* at 571-72 (internal citations omitted). "[S]peculation is insufficient to carry [a Defendant's] burden" to prove direct threat. *Henningson v. City of Blue Earth*, 184 F. Supp. 3d 710, 721 (D. Minn. 2016). An employer's subjective, good faith belief that an employee poses a direct threat is also insufficient to support this affirmative defense. *Fahey v. Twin City Fan Companies, Ltd.*, 994 F. Supp. 2d 1064, 1073 (D.S.D. 2014) (citing *Bragdon v. Abbott*, 524 U.S. 624, 649 (1998)).

Here, as also related to the question of whether Witchet was a qualified individual, the record presents doubt as to whether Union Pacific conducted an individualized analysis through its FFD process and whether it relied upon the "best current medical and other objective evidence" when evaluating the alleged risks associated with Witchet's condition. Specifically, factual questions exist about Witchet's actual risk of future sudden incapacitation at the time of his FFD review, and whether Union Pacific's assessment of Witchet's risk was objectively reasonable considering the best medical and other evidence. Dr. Holland, Dr. Charbonneau, and Dr. Wilson "receive[ ] no special deference simply because [they are] health care professional[s]." *Bragdon*, 524 U.S. at 649.

As an initial matter, no one affiliated with Union Pacific examined Witchet in person related to his October 2015 neurological incident. (*See* Plf. Ex. 1H, Witchet Dep., at 174:22-24; 175:10; Plf. Ex. 1E, Holland Dep., at 28:16-17; Plf. Ex. 1D, Charbonneau Dep., at 29:1-6; Plf. Ex. 1F, Wilson Dep., at 111:11-13.) Witchet's treating neurologist, Dr. Rehman, testified that examining a patient with a neurological condition is very important, and that a doctor gets a better sense of a patient's condition from examining a

patient in-person rather than simply reviewing records. (Plf. Ex. 1B, Rehman Dep., at 98:25-100:14.) Furthermore, the FMCSA Medical Examiner Handbook, the guidance upon which Union Pacific relied when evaluating Witchet, explicitly states that the Handbook "provides information and guidance to the medical examiner who performs the commercial driver medical examination." (Def. Ex. 2B at 7.)

Union Pacific's assessment of Witchet had further flaws. Factual questions exist as to whether Union Pacific's unquestioned reliance on the FMCSA guidelines satisfies its obligation to rely upon the best current medical and other objective evidence. *Cf. Bragdon*, 524 U.S. at 650-53 (questioning the decisionmaker's reliance on CDC Guidelines when assessing level of risk in a direct threat context). Dr. Wilson, for example, testified that the distinction between one-year and five-year waiting periods articulated in the FMCSA Handbook for Witchet is "totally arbitrary." (Plf. Ex. 1F, Wilson Dep., at 60-61.) Furthermore, both Dr. Wilson and Dr. Rehman indicated that the risk for future seizures is less when a brain lesion/stroke is small; however, the FMCSA guidelines place no weight on the size of a lesion/stroke when articulating suggested waiting periods. (*See* Plf. Ex. 1F, Wilson Dep., at 61:7-8 (indicating the risk for seizure is less with a small lesion), Plf. Ex. 1B, Rehman Dep., at 72:21-25; *cf.* Def. Ex. 2B.).

Furthermore, to the extent the Court endorses application of the FMCSA Handbook waiting periods, there is a question as to whether Union Pacific applied the correct one. As Dr. Trangle noted, the FMCSA Handbook lumps TIAs and minor strokes with minimal or no residual impairment together and prescribes a one-year waiting period. (Plf. Ex. 1C, Trangle Dep., at 24:14-18; Def. Ex. 2B at p. 160.) By all accounts, if Witchet did, indeed, have a stroke, he arguably should have been placed in the one-year category. As Dr.

Rehman indicated, and Dr. Trangle agreed, the severity of Witchet's condition – whether classified as a TIA or a CVA – was minor and presented no negative impact on Witchet's ability to perform the duties of a Truck Operator. As Dr. Trangle notes:

> [Witchet] had a complete workup to quantify the severity of his underlying neurological and cardiovascular, as well as potential pulmonary issues, and this was basically completely negative. He had no fixed brain abnormalities and no persistent impairment or neurological abnormality. It should have reasonably been concluded that he was at very low risk of experiencing sudden incapacitation after a one year waiting period and he should have been able to return to work and to his usual job and activities with no increased peril to himself, his fellow employee or the public.

(Plf. Ex. 1L, Trangle Rebuttal Expert Report, at 7.) Dr. Rehman also testified that "in [his] professional opinion, [Witchet] was stable enough to return to work" and that, when Dr. Rehman last examined Witchet in August 2016, he did not have any permanent symptoms of a stroke at that time. (Plf. Ex. 1B, Rehman Dep., at 52:4-5; 98:10-14.)

The uniform nature of Union Pacific's FFD review and application of restrictions is further evidenced by Ross's testimony that restrictions were generally standardized based on position and general type of medical condition (in this case, a condition that was deemed to cause "sudden incapacitation"). (Plf. Ex. 1T, Ross Dep., at 35:22-36:18; 38:16-39:6.) This undercuts the notion that Witchet was given an individualized assessment and was instead given standardized treatment based on Union Pacific's determination that he had suffered a CVA. This further raises a factual question as to whether Union Pacific can satisfy its direct threat affirmative defense.

## IV.    Witchet's Unlawful Screening Claim

Summary judgment is also inappropriate on Witchet's claim for unlawful screening

under the ADA.[7] An employer may not discriminate against an employee by "using qualification standards, employment tests, or other selection criteria that screen out or tend to screen out an individual with a disability" unless the standard is "shown to be job-related . . . and is consistent with business necessity[.]" *See* 42 U.S.C. § 12112(b)(6). Qualification standards include "medical, safety and other requirements established by [an employer] as requirements . . . to be eligible for the position held or desired." 29 C.F.R. § 1630.2(q). Union Pacific's fitness-for-duty and reportable health events policies and, more specifically, its "one percent standard" for issuing sudden incapacitation restrictions, violate the aforementioned provision.

Union Pacific uniformly relies upon a "one percent standard" to determine whether an employee or applicant's risk for future sudden incapacitation precludes continued employment with the railroad. (*See e.g.,* Plf. Ex. 1E, Holland Dep., at 92:13-16; 106:19-22; 112:2-7.) This standard undoubtedly adversely affects disabled individuals at disproportionate rates, screening out those with any condition that comes with even a remote threat.

In support of its motion on Witchet's unlawful screening claim, Union Pacific argues that Witchet *must* present statistical evidence in order to prove his claim. That is not settled law. In fact, the preeminent Supreme Court case addressing this type of claim, *Raytheon v. Hernandez*, does not articulate a specific statistical evidence requirement. 540 U.S. 44 (2003). Furthermore, the two cases upon which Union Pacific relies in support of its argument are unpersuasive: *Pierce v. Marsh*, 859 F.2d 601, 604 (8th Cir. 1988), is a case addressing disparate impact discrimination under Title VII; *Roberts v. City of*

---

[7] Defendant refers to this as Witchet's Disparate Impact claim. (Def. Mem. at 33.)

*Chicago*, 817 F.3d 561 (7th Cir. 2016), a case addressing a motion to dismiss, does not articulate a specific requirement for what is necessary to show a "relevant and statistically significant disparity."

The Court should, instead, look to the relevant federal regulations and the ADA itself to decide Union Pacific's motion on Witchet's unlawful screening claim. The text of both the regulations and the statute makes clear that *all* that is required for a disparate impact claim is that a plaintiff identify a practice that screens out or tends to screen out an individual with a disability. *See* 42 U.S.C. 12112(b)(6); 29 C.F.R. § 1630, App.

Relatedly, Union Pacific's one percent standard was recently addressed in a case without statistical evidence, *Montgomery v. Union Pacific*. 2018 WL 6110930, *7 (D. Ariz. Nov. 21, 2018) (finding a triable issue of fact as to whether Union Pacific utilizes a qualification standard that screens out disabled individuals). In *Montgomery*, the Court determined that "it is a logical inference that non-disabled people are less likely than disabled people to become suddenly incapacitated. . . . If so, then the 1% policy would 'tend to screen out an individual with a disability….'" *Id.* (quoting 42 U.S.C. § 12112(b)(6)).

> a. **Union Pacific's discriminatory qualification standard is not job-related or consistent with business necessity.**

Because, at a minimum, factual questions remain as to whether Union Pacific's one percent standard unlawfully screens out disabled employees, Defendant has the burden of proving that the standard satisfies the business necessity affirmative defense. 42 U.S.C. § 12113(a); *see also Chevron U.S.A. v. Echazabal*, 536 U.S. 73 (2002). To show "job relatedness," Union Pacific must demonstrate that its one percent standard "fairly and accurately measures the individual's actual ability to perform the essential functions of the

job." *Bates*, 511 F.3d at 996 (collecting cases and citations). In other words, Union Pacific must show that the standard is necessary and related to "the specific skills and physical requirements of the . . . position." *Belk v. Southwestern Bell Tel. Co.*, 194 F.3d 946, 951 (8th Cir. 1999). Under the ADA, the term "business necessity" is interpreted consistent with its use in Section 504 of the Rehabilitation Act. 29 C.F.R. § 1630 App. Courts have held that the "business necessity" standard is "quite high, and is not to be confused with mere expediency." *Bates*, 511 F.3d at 996 (internal quotation marks and citations omitted).

With respect to job-relatedness, Union Pacific fails to show that its one percent threshold accurately measures employees' *actual* abilities to perform the essential functions of their positions. While Union Pacific touts its individualized assessments of employees, the "assessment" only goes so far as to label the employee with a medical condition and, therefore, a generalized concept of risk. Union Pacific's FFD process – driven by this one percent rule – effectively does not look to an employee's functional abilities and the intricacies of one's actual job duties. Furthermore, as Dr. Wilson testified, there is no way to medically quantify an individual's specific risk and that there's a lot of "uncertainty." (Plf. Ex. 1F, Wilson Dep., at 78:17-79:3.) That level of uncertainly, at bottom, calls into question whether this threshold is simply arbitrary or whether it is appropriately related to the jobs these employees are performing.

Nor is the one percent standard consistent with business necessity. As an initial matter, Union Pacific is not legally required to apply the guidelines in the FMCSA Handbook. As the Handbook itself indicates, "[G]uidelines, such as advisory criteria and medical conference reports, are *recommendations*." (Def. Ex. 2B at   51; *cf. id.* ("Regulations/standards are laws and must be followed.").) Furthermore, Union Pacific has

failed to articulate why this *particular* standard was necessary, or show the absence of a different, less discriminatory evaluation criteria for determining whether an employee is able to perform the essential functions of their position. *See Rohr v. Salt River Project Agriculture Imp. and Power Dist.*, 555 F.3d 850, 863 (9th Cir. 2003). Union Pacific cannot show that relying on its hyper-strict one-percent standard is consistent with business necessity.

By utilizing its one percent standard across the board for all employees in safety-sensitive positions, including Witchet, Defendant "asserts a blanket safety-based qualification standard – beyond the essential job function – that is not mandated by law [and] screens out or tends to screen out an individual with a disability." *See Littlefield*, 195 F.3d at 1159 (quoting *Bates*, 511 F.3d at 992-93, citing in turn 42 U.S.C. § 12113(a)). As such, Union Pacific is not entitled to summary judgment on Witchet's unlawful screening claim.

## <u>CONCLUSION</u>

Union Pacific discriminated against Witchet when it regarded him as disabled due to his neurological condition and failed to conduct a proper individualized inquiry prior to determining that his condition posed a direct threat. Furthermore, Union Pacific's discriminatory one percent standard screens out or tends to screen out disabled individuals, and Union Pacific has not and cannot show that this particular standard is job-related and consistent with business necessity. Union Pacific's motion for summary judgment should therefore be denied for these reasons, and for all other reasons stated herein.

Dated: June 5, 2019                      **NICHOLS KASTER, PLLLP**

s/Lindsey E. Krause
James H. Kaster* (MN #53946)
    kaster@nka.com
David E. Schlesinger* (MN #387009)
    schlesinger@nka.com
Lindsey E. Krause* (MN #398431)
    lkrause@nka.com
4600 IDS Center
80 South 8th Street
Minneapolis, MN 55402
Telephone: (612) 256-3200
Fax: (612) 338-4878
*admitted pro hac vice

**ATWOOD, HOLSTEN, BROWN DEAVER & SPIER, P.C., LLO**
Corey L. Stull
    cstull@atwoodlawyers.com
575 Fallbrook Boulevard, Ste. 206
Lincoln, NE 68508
Telephone: (402) 817-2717

**ATTORNEYS FOR PLAINTIFF**

## CERTIFICATE OF SERVICE

I hereby certify that on June 5, 2019, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which sent notification of such filing to the following:

Scott Parrish Moore
spmoore@bairdholm.com

David P. Kennison
dkennison@bairdholm.com

and I hereby certify that I have mailed by United States Postal Service, postage prepaid, and email this document to the following non CM/ECF participants: None.

s/Lindsey E. Krause
Attorney for Plaintiff