IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| MARCUS WITCHET, | |
| Plaintiff, | **8:18CV187** |
| vs. | |
| UNION PACIFIC RAILROAD CO., | **MEMORANDUM AND ORDER** |
| Defendant. | |

This matter is before the Court on defendant Union Pacific Railroad Co.'s ("U.P." or "the Railroad") motion for summary judgment, Filing No. 57. Plaintiff Marcus Witchet alleges that U.P. violated the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, as amended by the ADA Amendments Act of 2008 ("ADAAA"), Pub. L. No. 110-325, 122 Stat. 3553 (2008)), in when it imposed work restrictions that prevent him from performing his job as a truck driver for five years. He alleges disability discrimination, failure to accommodation, unlawful screening under § 42 U.S.C. § 12112(a) & (b)(6) and an impermissible medical exam. U.P. denies the plaintiff's allegations and asserts affirmative defenses of business necessity and direct threat.

In its motion for summary judgment, U.P. argues that Witchet's disability claim fails as a matter of law because 1) the undisputed facts show that the plaintiff cannot establish a prima facie case; and 2) reliance on Department of Transportation ("DOT") regulations is a complete defense to Witchet's claim. The Railroad contends that undisputed evidence shows that it made a reasonable, safety-based judgment in reliance on objective medical evidence, the conclusions of medical professionals and guidance under the

1

Federal Motor Carrier Safety Act ("FMCSA").[1]  It argues that it has satisfied its burden to establish the medical necessity defense.   In response, Witchet argues there is disagreement among experts and there are genuine issues of material fact.

I.    Facts

The following are gleaned in part from the parties' respective statements of undisputed fact and the record.[2]  *See* Filing No. 58, defendant's brief at  2-14; Filing No. 67, plaintiff's response brief; Filing No. 77, defendant's reply brief at 3-15.  The parties agree that as of October 2015, Witchet had worked at Union Pacific for four years, starting as a Trackman and then moving to a Truck Operator position in February 2012.  Witchet has had a Texas Class A interstate commercial driver's license ("CDL") since 2000.  As part of the requirements for his CDL, Witchet has undergone several medical examinations by certified medical examiners, including after October 2015, and has been medically cleared to retain his CDL.  Witchet was most recently re-certified in 2018.

On October 16, 2015, Witchet began feeling numbness in his left arm and admitted himself to Mother Frances Hospital in Tyler, Texas.  Witchet's symptoms caused an emergency room doctor to be "concerned for a stroke."  Filing No. 61-1, Ex. 1C, Medical Records at 16.  Witchet underwent a neurological workup, including CT and MRI brain imaging studies.  *Id.* at 8, 16.  The MRI indicated the presence of "a small/punctate focus of restricted diffusion identified within the right parietal matter/posterior centrum semiovale region," but was otherwise "[n]egative for hemorrhage or other significant finding."  *Id.* at 8.  Witchet's hospital discharge records state that his "primary diagnosis"

---

[1] The FMCSA is a separate administration within the Department of Transportation ("DOT").

[2] Generally, statements without a citation to the record are facts agreed on by the parties in their respective statements of undisputed facts.

was an "Acute CVA (Cerebrovascular Accident)." *Id.* at 4.  An "acute cerebrovascular accident" is the medical term for "stroke."  Filing No. 60-8, Ex. 1L, Deposition of Dr. Atta Rehman ("Rehman Dep.") at 20.

Witchet states he was told by his hospital treatment team that the tests performed at the hospital did not show a concrete diagnosis.  At the time, the doctors suggested to Witchet that he may have had a transient ischemic attack ("TIA") or that he could have multiple sclerosis ("MS").  A transient ischemic attack is a brief episode of neurological dysfunction that, unlike a stroke, is not associated with permanent death of brain tissue.  Witchet states he was never verbally informed he had suffered a CVA or stroke.  Witchet's hospital records indicate that there "was no evidence of residual deficit on the day of discharge."  Filing No. 61-1, Ex. 1C, Medical Records at 4.

After his release from the hospital, Witchet was seen by his primary care physician, Dr. Syed Zaidi on October 22, 2015.  The records from that visit identify Witchet's "chief complaint" as "[f]ollow U.P. on stroke" and state "experiencing some dizziness."  Filing No. 61-2, Zaida Records at 1.  Dr. Zaidi referred Witchet to a neurologist, Dr. Atta Rehman.  *Id.*

Witchet first saw Dr. Rehman on October 20, 2015.  Witchet complained of dizziness.  Filing No. 70-1, Ex. 1H, Medial Records at 3.  Based on his examination, Dr. Rehman ordered MRIs of Witchet's brain and cervical spine.  Dr. Rehman and Witchet reviewed these MRIs together on November 9, 2015.  *Id.* at 4.  The radiology report on November 9, 2015, indicated "[n]o acute hemorrhage, acute ischemia, or mass."  Filing No. 69-3, Ex. 1B, Rehman Dep. at 43; Filing No. 61-11, MRI Record at 4.  Dr. Rehman interpreted this to mean "no bleeding on the brain, no stroke due to ischemia, lack of

blood supply, or clot in the brain, or no tumor or mass in the brain." Filing No. 69-3, Ex. 1B, Rehman Dep. at 43. The radiology report also noted "disorder of brain, unspecified." Filing No. 61-11, Ex. 3B, MRI Records at 2.

Witchet informed Union Pacific's Health and Medical Services Department of his medical situation on October 19, 2015 and was informed that Union Pacific would conduct a fitness-for-duty review. Witchet was placed on a temporary medical leave of absence pending the outcome of the review.

Witchet's fitness-for-duty review was initially handled by Dr. John Charbonneau, an Associate Medical Director at U.P. Witchet authorized U.P. to contact his various doctors directly to gather the records. U.P. continued to receive Witchet's records throughout November and December 2015.

Dr. Charbonneau advised the Health and Medical Services Department that Witchet's records showed several serious health conditions. Dr. Charbonneau first noted that the "limited information" to date included diagnoses of a stroke, a brain lesion (type not specified), a possible cardiac condition, and a lumbar (spine) issue. Dr. Charbonneau concluded that Witchet remained not fit-for-duty until U.P. could obtain all the relevant medical records and test results for these conditions.

In mid-December 2015, U.P. received the results of the November 9, 2015, MRI ordered by Dr. Rehman. Dr. Charbonneau wrote that the November 9, 2015, MRI "does not show a definite CVA [stroke] but that does not mean that he did not have one. The original MRI showed a small parietal white matter CVA and one of his discharge diagnoses was CVA." Filing No. 61-10, Ex. 3A, Medical Comments History at 28. The November 9, 2015, MRI record shows that it was read without comparison to the October

4

16, 2015, MRI taken during Witchet's hospital stay several weeks earlier.  Filing No. 61-10, Declaration of Dr. John Charbonneau ("Charbonneau Decl.");  Filing No. 69-11, Ex. 3B, MRI record.

In late December 2015, U.P. cleared Witchet for duty as to his cardiac and spine conditions but indicated that it could not render a final fitness-for-duty decision until it reviewed additional neurological records.  At that time, Dr. Charbonneau noted that Witchet would need medical restrictions for at least one year, possibly longer depending on the content of the forthcoming records.

In early January 2016, Witchet authorized Dr. Charbonneau to speak with Dr. Rehman because Dr. Charbonneau suspected that Witchet had suffered a stroke, whereas Dr. Rehman, as of January 2016, believed that Witchet had suffered a TIA. Filing No. 61-9, Ex. 3, Charbonneau Decl.  The two doctors eventually spoke on the phone, and Dr. Rehman sent U.P. additional clinical notes from Witchet's two visits.

In late January 2016, without objection by Witchet, U.P. retained Dr. Reed Wilson, a board-certified neurologist, for an independent file review and assessment of Witchet's condition.  Dr. Wilson concluded that Witchet had suffered a "small right parietal stroke on October 16, 2015 with no measurable permanent clinical residuals."  Filing No. 61-7, Ex. 2A, Wilson Report at 3.  Dr. Wilson also stated that Witchet had a "moderate to high risk for future sudden incapacitation."  *Id.*  Dr. Wilson based this conclusion on the risk assessments and recommendations set forth in FMCSA guidance.  *Id.*

Based on the medical documentation of Witchet's clinical symptoms and medical records, and confirmed by Dr. Wilson's report, U.P. concluded that Witchet suffered a stroke in the cortical/subcortical area of the parietal lobe of his brain.  Filing No. 61-10,

5

Ex. 3A, Medical Comments History; Filing No. 61-6, Ex. 2, Declaration of Dr. John Holland ("Holland Decl.") at 2; Filing No. 61-9, Charbonneau Decl. at 2. The FMCSA Medical Examiner Handbook states that cortical and subcortical deficits correlate with an increased risk for seizures, while cerebellum and brainstem vascular lesions do not. The FMCSA Handbook recommends different waiting periods for strokes based on their location: a minimum 1 year waiting period if not at risk for seizures (cerebellum or brainstem vascular lesions) and a minimum 5 year waiting period if at risk for seizures (cortical or subcortical deficits).

After receiving Dr. Wilson's report, U.P. issued functional work restrictions for a period of five years that prohibited Witchet from operating company vehicles on-track or mobile equipment, forklifts, cranes, hoists or machinery; working on or near moving trains, freight cars or locomotives; and working at unprotected heights over four feet. Filing No. 69-10, Ex. 1P, Restriction Review Form. U.P. informed Witchet that it would reassess the restrictions if he remained neurologically stable and seizure-free for five years. U.P. issued the restrictions for five years based on Dr. Wilson's conclusion that Witchet suffered a "parietal stroke" and the corresponding FMCSA guidelines.

U.P. later agreed to reconsider and instructed Witchet to obtain his CT and MRI images for an independent review. Witchet did so and sent the imaging studies to both U.P. and Dr. Rehman. U.P. then sent them to Dr. Wilson for review.

Witchet visited Dr. Rehman again in August 2016, and Dr. Rehman reviewed Witchet's October 16, 2015, MRI image for the first time. Filing No. 60-8, Ex. 1L, Dr. Rehman Dep. at 50, 61. Dr. Rehman stated that the October 2015 MRI showed a small area of restricted diffusion in the right parietal white matter region that did not appear on

the November 9, MRI. Filing No. 69-3, Ex. 1B, Rehman Dep. at 62. Dr. Rehman testified

to a reasonable degree of medical certainty that Witchet's October 2015 MRI "absolutely"

did show a small stroke in the right parietal lobe. *Id.* at 62, 65. He also conceded there

was a risk of seizure from stroke depending on location in brain. *Id.* at 62, 73. Dr. Rehman

testified that although Witchet's neurological event happened in an area that comes with

some risk for future seizures, Witchet's risk was "maybe slightly [sic], maybe minimum"

and that "it's unlikely. It's—number one, it's very tiny. It's in the white matter. It's quite

unlikely." *Id.* at 73. Dr. Rehman diagnosed Witchet with a stroke but stated that it was

"tiny. It's punctate." *Id.* at 66. Furthermore, Dr. Rehman testified that his diagnosis of

CVA did not have an impact on his medical opinion that Witchet was neurologically stable

to return to work as of February 2016. *Id.* at 69.

Dr. Wilson reviewed the images and issued an addendum report on or about

August 15, 2016. Filing No. 61-8, Ex. 2C, Wilson Addendum. In that report, Dr. Wilson

noted that he had not seen the imaging studies at the time of his initial report. *Id.* at 1.

Dr. Wilson concluded in the addendum report that Witchet suffered a "confirmed stroke."

*Id.* at 2. Dr. Wilson also concluded that "based on the recommendations of the FMCSA,

there is a risk for seizures for five years, and restrictions for this period of time are

appropriate. I think the stroke represents a fixed structural lesion which poses risk for

future seizures for five years." *Id.* at 3.

In September 2016, based on Dr. Wilson's reports, U.P. denied Witchet's request

for reconsideration of the restrictions. Filing No. 61-10, Ex. 3A, Medical Comments

History.

Witchet's retained expert, Dr. Kevin Trangle, opined that Witchet had a TIA (not a stroke) and U.P. should have imposed a one-year as opposed to a five-year driving restriction.  Filing No. 70-4, Ex. 1L, Dr. Kevin Trangle Rebuttal Report at 4, 7.  Dr. Trangle opined that Witchet's symptoms could be considered consistent with a TIA and a stroke. Filing No. 69-4, Ex. 1C, Deposition of Kevin Trangle ("Trangle Dep.") at 33.  Based on his review, Dr. Trangle's opinion "within a reasonable degree of medical certainty" is that Witchet had a TIA and not a stroke."  Filing No. 70-4, Ex. 1L, Rebuttal Report at 7.  Dr. Trangle reasoned that the MRI conducted at the hospital was likely "done precisely at the point of the TIA with demonstrated decreased profusion, which is a transient phenomenon characteristic of a TIA."  Filing No. 61-5, Ex. 11, Dr. Trangle's Independent Medical Records review at 12.  Dr. Trangle concluded that Witchet's "overall clinical presentation including his imaging findings are totally consistent with other cases described in the medical literature who have been characterized as having a TIA as opposed to actual strokes."  Filing No. 70-4, Ex. 1L, Rebuttal Report at 7.  Dr. Trangle conceded that "all the symptoms that one had from TIA ultimately can be consistent with a stroke if they have two things: One is a persistence of symptoms beyond 24 hours, and evidence of brain damage through having infarct or edema or other abnormalities on the actual MRI scan." Filing No. 69-4, Trangle Dep. at 33.  In his report, Dr. Trangle states:  "[o]verall, there was no evidence of a stroke with permanent brain injury; both his clinical and radiographic abnormalities had completely resolved.  His presentation fit squarely within the definition of TIA."  Filing No. 70-4, Ex. 1L, Rebuttal Report at 7.  He acknowledged, however, that "[t]here were findings consistent with very mild subcortical microvascular disease in both cerebral hemispheres," though that finding was common "on brain MRIs in individuals of

his age." *Id.* at 7.  Dr. Trangle disagreed with Dr. Holland's restrictions, concluding that "the transient area of right parietal punctate ischemic change inappropriately led to a diagnosis of a cerebral infarct or stroke as opposed to TIA." *Id.* at 4.

Dr. Charbonneau testified that there was no question about the location of the stroke and it indicated a thrombolic or embolic stroke. Filing No. 78-3, Ex. 5B, Deposition of John Charbonneau ("Charbonneau Dep.") at 85.  He also stated that Dr. Wilson's report indicated that Witchet:

> had no measurable permanent clinical residuals. That is a good thing. We all  agree with that.  But that doesn't mean it was an insignificant stroke. And it looked to me like his dizziness was an ongoing symptom for a significant amount of time—excuse me, dizziness and arm weakness was an ongoing symptom for about three weeks or so.  So I just think that this puts this in the general category of a significant stroke, and that is why I decided to use the five years of sudden incapacitation restrictions.

*Id.* at 78-3 at 88.

Dr. Wilson testified that "[t]here's a risk factor—there is a risk of having a stroke— or having a seizure after a stroke, leading to sudden incapacitation, but it diminishes with the passage of time.  It's less with a small lesion, but there's a risk there." Filing No. 69-7, Ex. 69-7, Ex. 1F, Wilson Dep. at 61.  He concluded in his addendum report, to a reasonable degree of medical certainty, that "a five-year restriction was appropriate" for Mr. Witchet.  *Id.* at 73.  He based his opinion that five years was appropriate, as opposed to one year, on the location of the stroke in the brain, stating the location was important "in the sense that it's in the hemispheres, it's in the parietal lobe, and it's subcortical.  It's not in the basal ganglia; it's not in the cerebellum or the brain stem or the deeper white matter.  It's near the surface of the brain." *Id.* at 78.  He testified that there was no question that Witchet was at increased risk of seizures based on the parietal stroke, as opposed to if he had had the stroke in the cerebellum or brain stem.  *Id.*

II.     Law

"Summary judgment is proper 'if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.'" *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc) (quoting Fed. R. Civ. P. 56(c)(2)). The court views facts in the light most favorable to the nonmoving party, and makes no determinations of credibility; nor does it weigh the evidence or draw inferences, as those functions belong to the jury. *Cottrell v. Am. Family Mut. Ins. Co., S.I.*, 930 F.3d 969, 971–72 (8th Cir. 2019). A party opposing a properly supported motion for summary judgment may not rest on the allegations contained in the pleadings, "but must set forth specific facts showing there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The record must indicate an absence of a genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Northport Health Servs. of Ark., LLC v. Posey*, 930 F.3d 1027, 1030 (8th Cir. 2019). Facts that, if altered, affect the outcome of a lawsuit under applicable substantive law, are material. *Cottrell*, 930 F.3d at 972. A material fact dispute is "genuine" if each party has supplied some evidence that is sufficient for a reasonable jury to return a verdict for the nonmoving party. *Id.* If "reasonable minds could differ as to the import of the evidence," summary judgment should not be granted. *Anderson,* 477 U.S. at 251.

The ADA prohibits covered employers from "discriminat[ing] against a qualified individual on the basis of disability" with respect to the terms and conditions of employment. 42 U.S.C. § 12112(a). The ADA also "prohibits employers from

discriminating against employees 'regarded as having . . . an impairment.'"  *Parker v. Crete Carrier Corp.*, 839 F.3d 717, 724 (8th Cir. 2016) (quoting 42 U.S.C. §§ 12102(1)(C), 12112(a)).  An ADA plaintiff may survive a defendant's summary judgment motion in one of two ways—by presenting either direct or inferential evidence of discrimination.  *Libel v. Adventure Lands of Am., Inc.*, 482 F.3d 1028, 1034 (8th Cir. 2007).  "'[D]irect evidence is evidence showing a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated the adverse employment action.'"  *Id.* (quoting *Griffith v. City of Des Moines*, 387 F.3d 733, 736 (8th Cir. 2004) (internal quotation omitted); *see Brown v. City of Jacksonville*, 711 F.3d 883, 888 (8th Cir. 2013).

A plaintiff alleging regarded-as discrimination may make out a prima facie case using the *McDonnell Douglas* burden-shifting framework.  *Parker*, 839 F.3d at 724.  A plaintiff must first show (1) the employer regarded him as having a disability, (2) he had the qualifications to perform the essential functions of his position with or without reasonable accommodation, and (3) the employer took an adverse action due do his perceived disability.  *Id.*  If the plaintiff fails to establish any element of his prima facie case, summary judgment is proper.  *Kellogg v. Union Pac. R. Co.*, 233 F.3d 1083, 1086 (8th Cir. 2000).  If the plaintiff succeeds in establishing a prima facie case, the burden shifts to the employer to proffer a legitimate, nondiscriminatory reason for the adverse action.  *Parker*, 839 F.3d at 724.  If the employer makes such a proffer, the burden shifts back to the plaintiff to show that the employer's stated reason is a pretext.  *Id.*

The ADA defines "qualified individual" as "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment

11

position that such individual holds or desires." 42 U.S.C. § 12111(8).  Essential functions are the "fundamental job duties of the employment position."  29 C.F.R. § 1630.2(n)(1). To the extent that an employer challenges an ADA plaintiff's claim that he can perform the job's essential functions, the burden of production is on the employer to come forward with evidence of those essential functions.  *See EEOC v. Wal-Mart*, 477 F.3d 561, 568 (8th Cir. 2007).

Discrimination also includes the use of "qualification standards, employment tests, or other selection criteria that screen out or tend to screen out an individual with a disability." 42 U.S.C. § 12112(b)(6).  Qualification standards include "medical, safety and other requirements established by [an employer] as requirements . . . to be eligible for the position held or desired." 29 C.F.R. § 1630.2(q).  An employer has an affirmative defense to a charge of discrimination for qualification standards that deny job benefits to individuals with disabilities if the standards are "shown to be job-related for the position in question and . . . consistent with business necessity."  42 U.S.C. § 12113(a).  Such standards may include "a requirement that an individual shall not pose a direct threat to the health or safety of other individuals in the workplace."  42 U.S.C. § 12113(b).  Under EEOC regulations, the "direct threat" defense is applicable whether the worker's disability poses a threat to his own safety or to the safety of others. *Chevron U.S.A. Inc. v. Echazabal*, 536 U.S. 73, 78 (2002) (quoting 29 C.F.R. § 1630.15(b)(2) (2001)).

In the Eighth Circuit, the burden is on the employer to prove a direct threat.[3] *EEOC v. Wal–Mart*, 477 F.3d at 571–72; *cf. Burroughs v. City of Springfield*, 163 F.3d 505, 508

---

[3] Some courts discuss "direct threat" in terms of whether an individual is qualified, rather than treating it as an affirmative defense, finding that an individual is not qualified if he presents a "direct threat" to his own health and safety or that of others. *See e.g., Gillen v. Fallon Ambulance Serv., Inc.*, 283 F.3d 11, 25-26 (1st Cir. 2002); *Turco v. Hoechst Celanese Corp.*, 101 F.3d 1090, 1094 (5th Cir. 1996); *Rizzo v.*

(8th Cir. 1998) (stating that "[A]n individual may not be qualified for a position if that individual poses a 'direct threat' to the health or safety of others[.]") (citing 42 U.S.C. § 12113(b)).  "The direct threat defense must be 'based on a reasonable medical judgment that relies on the most current medical knowledge and/or the best available objective evidence,' and upon an expressly 'individualized assessment of the individual's present ability to safely perform the essential functions of the job,' reached after considering, among other things, the imminence of the risk and the severity of the harm portended." *Chevron*, 536 U.S. at 86 (quoting 29 C.F.R. § 1630.2(r)); *see EEOC v. Wal-Mart Stores*, 477 F.3d at 571.  This individualized analysis is necessary "in order to 'protect disabled individuals from discrimination based on prejudice, stereotypes, or unfounded fear.'" *EEOC v. Wal-Mart Stores*, 477 F.3d at 571 (quoting *Nunes v. Wal-Mart Stores, Inc.*, 164 F.3d 1243, 1248 (9th Cir.1999)).

The ADA states that an employer may require a transportation industry employee to comply with standards established by DOT regulations.  42 U.S.C. § 12114(c)(5); *see Wyatt v. J.B. Hunt Transp., Inc.*, No. 4:08CV01501JMM, 2009 WL 652723, at *3 (E.D. Ark. Mar. 12, 2009), *aff'd*, 366 F. App'x 718 (8th Cir. 2010)(unpublished *per curiam*). Under the DOT regulations that govern the transportation industry, a motor carrier may not allow a driver to operate a commercial motor vehicle if the driver may suffer from an impairment that makes it unsafe for her to operate the vehicle.  49 C.F.R. § 392.3.  The physical requirements for interstate drivers of commercial vehicles are governed by 49

---

*Children's World Learning Centers, Inc.*, 84 F.3d 758, 763-64 (5th Cir. 1996); *Michael v. City of Troy Police Dept.*, 808 F.3d 304, 307-08 (6th Cir. 2015); *Bodenstab v. County of Cook*, 569 F.3d 651, 658 (7th Cir. 2009); *McKenzie v. Benton*, 388 F.3d 1342, 1353-55_ (10th Cir. 2004); *LaChance v. Duffy's Draft House, Inc.*, 146 F.3d 832, 835-36 (11th Cir. 1998).

13

C.F.R. § 391.41.[4]  A person cannot lawfully operate a commercial vehicle if not qualified to do so in compliance with the FMCSA's applicable physical and medical standards.  49 C.F.R. §§ 391.11(a),(b)(4); 391.41.  In relevant part, the regulation states that a person is qualified if he or she "[h]as no mental, nervous, organic, or functional disease or psychiatric disorder likely to interfere with his/her ability to drive a commercial motor vehicle safely."  49 C.F.R. § 391.41(b)(9).  Commercial truck drivers must be medically qualified to drive, which they establish by periodic physical examination—a driver must possess a DOT certification following a commercial driver fitness determination performed by a competent medical professional.  49 C.F.R. § 391.41; *see Clark v. Lyman-Richey Corp.*, No. 8:06CV669, 2008 WL 1733603, at *7 (D. Neb. Apr. 10, 2008).

Under the DOT regulations in force at the time of the decision at issue, "[a] person is physically qualified to drive a commercial motor vehicle if that decision person . . . has no established medical history or clinical diagnosis of epilepsy or of any other condition which is likely to cause loss of consciousness or any loss of ability to control a commercial motor vehicle."  49 C.F.R. § 391.41(b)(8) (2015).  The DOT issues guidance on interpretation of the DOT's regulations.  Department of Transportation, Federal Motor Carriers Safety Administration, National Medical Examiners Registry, Medical Examiner Handbook[5]; *see also* Filing No. 60-9, Appendix of Evidence, Defendant's Ex. 2B.  The Online Handbook contains guidance on "neurological regulations," including what constitutes a "condition likely to cause loss of consciousness."  *Id.* at 137-67.

---

[4] By federal definition, a commercial motor vehicle (CMV) is "used on a highway in interstate commerce" and weighs at least 10,001 pounds.  49 C.F.R. § 390.5.

[5] The handbook can be found at https://www.fmcsa.dot.gov/advisory-committees/mrb/fmcsa-medical-examiner-handbook ("Online Handbook").

The Online Handbook cautions medical examiners that:

As a medical examiner, it is important for you to distinguish between medical standards and medical guidelines. Regulations/standards are laws and must be followed. Whereas guidelines, such as advisory criteria and medical conference reports, are recommendations. While not law, the guidelines are intended as best practices for medical examiners.

Guidelines have been issued by the Federal Motor Carrier Safety Administration (FMCSA) to provide you with additional information and are based on medical literature. If you choose not to follow the guidelines, the reason(s) for the variation should be documented. You are responsible for determining if the commercial motor vehicle (CMV) driver is medically qualified and is safe to drive under the Federal Motor Carrier Safety Regulations (FMCSRs).

*Id.* at 51. Although the "DOT's Medical Advisory Criteria are only advisory and nonbinding, "the views of an agency such as DOT implementing a regulatory scheme designed to ensure the safety of our nation's highways 'constitute a body of experience and informed judgment' to which employers may properly resort for guidance." *Tate v. Farmland Indus., Inc.*, 268 F.3d 989, 994 (10th Cir. 2001) (declining to "second guess a legitimate business judgment on the part of DOT and its covered employers as to the necessary qualifications of CMV operators")(quoting *United States v. Mead Corp.*, 533 U.S. 218 (2001)); *see also Ward v. Skinner*, 943 F.2d 157, 161–164 (1st Cir. 1991) (Breyer, C.J.) (upholding DOT's refusal to provide a truck driver taking antiseizure medication "an individualized inquiry that would permit him to escape the application of a general agency rule" embodied in a task force recommendation).

With respect to cerebrovascular incidents or strokes, the Handbook provides for a recommended minimum waiting period of one year "if not at risk for seizures (cerebellum or brainstem vascular lesions)" and of five years if "if at risk for seizures (cortical or subcortical deficits)." *Id.* at 160-64; Filing No. 260-9, Defendant's Ex. 2B at 160. The Handbook recommends a waiting period of five years for an individual who suffers a

"[s]troke with risk for seizures" or a "[i]ntracerebral or subarachnoid hemorrhage with risk for seizures" and a one year waiting period for an individual who suffers a "transient ischemic attack, stroke, or intracerebral or subarachnoid hemorrhages with no risk for seizures." Online Handbook at 166. The Online Handbook also recommends certification of a driver if the

> driver with a history of intracranial or subarachnoid hemorrhage has: Completed the appropriate waiting period, a normal physical examination, neurological examination including neuro-ophthalmological evaluation, and neuropsychological testing, no neurological residuals or, if present, residuals of a severity that do not interfere with the ability to operate a commercial motor vehicle, and/or clearance from a neurologist who understands the functions and demands of commercial driving.

*Id.*, Online Handbook at 163.

III.   DISCUSSION

Viewing the evidence in the light most favorable to Witchet, he has presented evidence from which a reasonable jury could find that he was restricted on the basis of a perceived disability, as that term is defined in the 2008 amendments to the ADA. U.P. was clearly aware of the incident that resulted in Witchet's hospitalization in October 2015. The record supports a conclusion that U.P. imposed restrictions because it regarded Witchet as having a risk of a sudden loss of consciousness as a result of the episode. The evidence in the record indicates that U.P. regarded Witchet as disabled by reason of that risk.

U.P. contends Witchet cannot show he is a "qualified individual" within the meaning of the ADA and argues it is entitled to summary judgment based on Witchet's failure to establish his prima facie case under McDonnell-Douglas. Whether analyzed with reference to whether the plaintiff has shown he is a qualified individual under the ADA for purposes of whether he can show a prima facie case, or with reference to whether the

defendant has sustained its burden to show business necessity or direct threat as an affirmative defense, the result is the same—there is no genuine dispute on any issue of material fact and the defendant is entitled to judgment as a matter of law.

The record shows that the plaintiff's impairment prevents him, temporarily, from performing essential job functions in that he cannot meet DOT physical requirements under medical guidelines in order to drive a commercial motor vehicle safely. There is no question that driving a truck that weighs over 10,00 pounds is an essential part of this job. There is no evidence that the plaintiff sought, or the defendant could provide, a reasonable accommodation for plaintiff. [6] The Court concludes that no reasonable juror could find that U.P discriminated against him on the basis of his disability in imposing a five-year waiting period after there was evidence that he had suffered a cortical stroke.

U.P. has shown that it followed FMCSA Medical Examiner Handbook guidelines in imposing restrictions on Witchet before he could return to the Truck Operator position. Employers may rely on the FMCSA guidelines to establish medical qualifications for commercial drivers. Witchet acknowledges, and his retained expert agrees, that there is no way to medically quantify an individual's specific risk of seizure following a stroke event. In view of the magnitude of the risk and the severity of the harm, it was reasonable for U.P. to credit the opinions of Drs. Rehman, Wilson, Charbonneau and Holland that Witchet's reinstatement within five years of his cerebrovascular event posed a risk of sudden incapacitation. Witchet's own treating neurologist acknowledged that Witchet had experienced a stroke in the area of the brain that is more likely to cause seizures. Though

---

[6] With respect to his failure to accommodate claim, Witchet did not address that claim in his brief. However, neither did U.P. present evidence establishing it is entitled to judgment as a matter of law on that issue. Because it appears that Witchet is not pursuing the claim, the Court considers the claim abandoned and will not issue a ruling on the substantive merits of any such claim.

Dr. Rehman characterized the stroke as tiny, he acknowledged it was a stroke and had the potential to cause a seizure, though the risk was small.  Though Witchet's retained expert diagnosed a TIA rather than a seizure on his review of the medical record, that opinion is not completely at odds with the other experts' assessments.  Dr. Trangle acknowledged that residual effects of the cerebrovascular event beyond a twenty-four hour period would make the diagnosis of a stroke more likely.  Evidence in the record shows that Witchet continued to suffer from dizziness for days to weeks after the event. Under the FMCSA's clear guidance, a person should not drive commercial vehicles for five years following a stroke in the cortical area of the brain.

The Court agrees that the evidence shows Witchet is temporarily not qualified to drive a commercial motor vehicle at U.P., but even if he were considered qualified, U.P. has sustained its burden to show as a matter of law which absolves its liability for any qualification standard that allegedly discriminates.  U.P.'s decision to limit Witchet from driving commercial trucks for five years after his stroke was based on a reasonable medical judgment, in reliance on objective evidence.  Contrary to Witchet's assertion, he did receive an individualized assessment of his abilities.  Witchet has not countered U.P.'s evidence Witchet is at risk for sudden loss of consciousness.  Four doctors, based on either an examination or an individualized assessment of his records, including MRI results, concluded that Witchet had a stroke in the parietal area of his brain.  The plaintiff's expert's testimony that the MRI was consistent with a TIA under circumstances wherein the TIA occurred while the patient was in the MRI does not necessarily controvert U.P.'s evidence.

U.P. sought and reviewed medical records, and obtained objective medical evidence, and solicited an independent evaluation of the plaintiff's condition and abilities. The record shows U.P.'s medical department's fitness for duty determination was a reasonable medical judgment that relied on current medical knowledge and objective evidence. The defendant sought review at several levels, considered the plaintiff's treating physician's opinion, sought independent review and responded to the plaintiff's retained expert's conclusions. Witchet received an expressly individualized assessment of his ability to safely perform the essential functions of the job.

There is no dispute that Witchet was at some risk of sudden incapacitation. In light of the risks U.P. would undertake in re-employing him before the expiration of the recommended waiting period, no reasonable juror could find that U.P. intentionally discriminated against Witchet by reason of a disability in imposing the temporary restrictions. U.P. relied on two of its own board-certified physicians and retained an independent, board-certified neurologist, all of whom concluded that Witchet had a stroke. Witchet's own neurologist agreed that the MRI taken at the time of Witchet's hospitalization indicated a cortical stroke. No doctor disputed application of the FMCSA guidelines. Although Witchet's retained expert believes that Witchet's symptoms are consistent with a TIA, that circumstance would still require a one-year waiting period. The ADA does not require employers to ignore the findings of their physicians and government regulations and guidance in order to avoid potential discrimination liability.

Two neurologists, including the plaintiff's own treating neurologist, diagnosed Witchet with a cortical stroke. The record shows that a cortical stroke carries a greater chance for sudden incapacitation than a cerebrovascular event located in another part of

the brain.  U.P.'s medical department's conclusions are based on government guidance.

In the face of that evidence, even viewed in the light most favorable to the plaintiff, Witchet

has not presented evidence from which a jury could conclude he was able to perform the

essential functions of the Truck Operator job.  U.P. has shown as a matter of law that that

it made a reasonable decision, based on reliable medical evidence in the context of

applicable governmental guidance, that Witchet temporarily poses a risk as a commercial

truck driver to his own safety and to the safety of the public.  Allowing Witchet to continue

driving could expose U.P. to a risk of liability that it is unwilling to take, and could expose

the public to a risk of injury.  Though that risk may be small, the consequences are severe.

U.P.'s restrictions, "reached after considering, among other things, the imminence of the

risk and the severity of the harm portended[,]" are reasonable.  *Chevron*, 536 U.S.at 86;

*see* 29 CFR § 1630.2(r)).  Therefore, the Court finds U.P.'s motion for summary judgment

should be granted.  Accordingly,

IT IS ORDERED that:

1.      The defendant's motion for summary judgment (Filing No. 57) is granted.

2.      A judgment of dismissal will be entered.

Dated this 21st day of February 2020.

BY THE COURT:

s/ Joseph F. Bataillon
Senior United States District Judge
